# In the United States Court of Federal Claims

No. 25-1637C

(Originally filed under seal: March 19, 2026)

(Public version filed: March 25, 2026)

|  |  |
|---|---|
| **NOBLIS MSD, LLC,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant,* | ) |
| **and** | ) |
| | ) |
| **SOLUTE, INC.,** | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |
| | ) |

*Rebecca Elizabeth Pearson*, Taft Stettinius & Hollister, LLP, Washington, D.C., for Plaintiff. Of counsel were *Suzanne Sumner*, *Brandon E. Dobyns*, *Celeste Friel*, and *Alexander Gorelik*.

*Kelly E. Palamar* and *Matthew Lewis*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With them on the briefs were *Brett A. Shumate*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Steven Michael Mager*, Assistant Director. Of counsel was *Diana King*, Naval Information Warfare Center.

*Joseph Alexander Ward*, Morrison & Foerster, LLP, Washington, D.C., for Defendant-Intervenor. Of counsel were *James A. Tucker*, *Victoria Dalcourt Angle*, and *Markus G. Speidel*.

<u>**OPINION AND ORDER**</u>

**SOLOMSON, Chief Judge.**

In actions challenging a government procurement pursuant to 28 U.S.C. § 1491(b) — colloquially referred to as bid protests[1] — the judges of this Court have repeatedly stressed the need for plaintiffs to: (1) plead, and then prove, *facts* demonstrating both standing and prejudicial error; and (2) properly support requests for permanent injunctive relief. We have said this to the point of it being tiresome, in both bar-sponsored panel discussions, as well as our decisions.[2] These are more than just practice pointers for improving an argument; they are ironclad rules that, when ignored or given short shrift, become a fatal stumbling block to what may be an otherwise meritorious case.

Here, plaintiff, Noblis MSD, LLC, challenges the award of an approximately $100 million contract for systems engineering and networking services that defendant, the United States — acting by and through the Department of the Navy — made to defendant-intervenor, Solute, Inc. As explained in detail below, Noblis successfully demonstrates that the government committed prejudicial error in evaluating Solute's proposal, but Noblis's victory is pyrrhic. That is because Noblis did not attempt to support its request for permanent injunctive relief. This case thus stands as yet another warning for parties and their counsel: your strategic choices and briefing matter.

---

[1] Procurements may solicit bids, proposals, or quotations. *See Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 91 (2020); *see also* Federal Acquisition Regulation 2.101 ("Offer means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids'; responses to requests for proposals (negotiation) are offers called 'proposals'; however, responses to requests for quotations (simplified acquisition) are 'quotations', not offers.").

[2] *See, e.g., Dev Tech. Grp., Inc. v. United States*, 179 Fed. Cl. 361, 370-75 (2025) (discussing standing and prejudice requirements); *KL3, LLC v. United States*, 176 Fed. Cl. 657, 675 (2025) (same); *Rotair Aerospace Corp. v. United States*, 167 Fed. Cl. 571, 577 (2023) ("The Court does not address this . . . request for injunctive relief [where plaintiff] entirely fails to demonstrate that it is entitled to such relief." (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004))); RBVETCO, LLC v. U.S., 172 Fed. Cl. 566, 579 (2024) (criticizing plaintiff for "fail[ing] to demonstrate or seek any specified relief in its" motion for judgment on the administrative record, and concluding that a request to "'set aside' the award" — without fully addressing the injunctive relief standards — is insufficient to warrant injunctive relief, even assuming the plaintiff had prevailed on the merits); *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 299 (2024) (denying injunctive relief where plaintiff "makes no attempt to support any of the injunctive relief factors with facts" but instead "relies on the talismanic invocation of injunctive relief guidelines found in various bid protest decisions").

## I.   FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.  The Consolidated Afloat Networks and Enterprise Services Procurement

#### 1.  The Navy's request for proposals.

On November 17, 2023, the Navy issued Request for Proposals No. N6600124R0022 (the "RFP" or "Solicitation"), AR 97, seeking:

> engineering, technical and programmatic services for networking, communication, and computer systems, and associated certification and information assurance for developments, current operations and planned upgrades to support Program Management Warfare (PMW) 160 Tactical Networks.

AR 104.[4]  These systems are part of the Consolidated Afloat Networks and Enterprise Services ("CANES"), a program that enables "Command and Control (C2) in naval, joint, coalition operations" and "provid[es] the gateway to achieving Information Warfare Dominance in the cyberspace domain." *Id.*  As its name implies with the word "afloat," the CANES contract's performance locations include ships deployed at sea in addition to various naval bases.  AR 244-45.

The Solicitation contemplated the award of a single indefinite-delivery, indefinite-quantity ("IDIQ") contract, with a cost-plus-fixed-fee pricing arrangement for services and a cost reimbursement (no fee) pricing arrangement for other direct costs.  AR 98-100,

---

[3] This background section constitutes this Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires courts to "make factual findings from the record evidence as if [they] were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54, 1356 (Fed. Cir. 2005).  Other factual findings are contained in the Discussion section of this opinion, *see infra* Section V.  Citations to the corrected administrative record, ECF No. 41, are denoted as "AR" followed by the page number bolded in the lower right-hand corner of each page of the administrative record.

[4] The Navy amended the initial RFP on December 11, 2023.  AR 279.

217. The contract covers a three-year base period and includes two two-year option periods.  AR 98-100.

Section L-2 of the RFP ("Submission of Proposals") instructed offerors to submit their proposals in three volumes: Volume I – Offer; Volume II – Price/Cost Information; and Volume III – Written Capability Information.  AR 221.  In Volume II, offerors were required to identify direct labor costs, *i.e.*, "the various labor categories and individual names (if known) intended for use under [the] contract" as well as the number of labor hours, hourly labor rates, total cost for each labor category, and the average bid rate by labor category.  AR 222.  In that regard, the Solicitation further instructed: "Do **not** submit average or composite rates for named individuals."  AR 223 (emphasis in original).  With respect to individuals unknown at the time of proposal, however, the RFP noted that "for proposal purposes, assume they will be employed in the San Diego Area and list intended labor category with anticipated rates from [Economic Research Institute ("ERI")] in the San Diego Area."  *Id*.

In order to "verify the realism" of proposed direct labor costs, each offeror was directed to "submit documentation substantiating the accuracy of its proposed direct labor rates for all labor categories."  AR 229.  "Acceptable documentation" included: (1) the most recent payroll run for named, current employees; (2) signed letters of intent indicating agreed upon salaries for named, new hires; (3) copies of the most current Defense Contract Management Agency ("DCMA") Forward Pricing Rate Agreement ("FPRA") or Forward Pricing Rate Recommendation ("FPRR") for unnamed, existing labor categories; (4) labor category averages; and (5) for proposed rates that do not fall within one of the above criteria, a "detailed, comprehensive description of the methodology used to establish the proposed direct rate."  AR 229-30.  The RFP noted that all proposed direct labor rates not based on, or clearly supported by, the five categories of acceptable documentation — and were lower than the ERI rates listed in the Solicitation — would be "adjusted upward to the ERI rate."  AR 230.

Offerors were also instructed to identify projected overhead rates and total overhead cost in Volume II of their proposals.  AR 223.  Offerors with different rates for government and contractor facilities were required to:

> (1) Propose on-Government-site overhead rates (i.e., rates associated with performance at Government facilities) for

> 90% of the level of effort for each labor category specified in [the Solicitation]; and
>
> (2) Propose off-Government-site rates (i.e., rates associated with performance at contractor facilities) for 10% of the level of effort for each labor category specified in [the Solicitation].

AR 223.

In Volume III of the proposal, each offeror was required to prepare an organizational experience matrix, AR 271, explaining the "breadth, depth and relevance" of its experience. AR 232. Offerors also had to cite "at least one (1) reference for work performed by the prime offeror, no more than one (1) reference per subcontractor, and no more than three (3) references total." *Id.* For each of these references, offerors were directed to submit one Reference Information Sheet. AR 272.

### 2. The Navy's evaluation criteria.

The Solicitation indicated the Navy would award the CANES contract to the offeror "determined to provide the 'best value' to the Government," which "may not necessarily be the proposal offering the lowest cost or receiving the highest technical rating." AR 237. The Navy committed to evaluating proposals using a four-step methodology, culminating in a best-value tradeoff decision, considering three technical factors and cost. *Id.*

*First*, the Solicitation required the Navy to determine the acceptability of each offer on an "Acceptable"/ "Unacceptable" basis. AR 238. An offer that "manifests the offeror's assent, without exception or imposition of condition, to the terms and conditions of this [RFP]" was deemed "Acceptable." AR 237. On the other hand, an offer that "takes exception to any of the terms and conditions of the RFP, imposes additional conditions or omits material information required by this RFP," could be considered "Unacceptable." *Id.*

*Second,* the Solicitation provided that the offerors' capability (Volume III) would be evaluated based on three technical factors: (1) organizational experience; (2) past performance; and (3) small business participation. AR 239. But the RFP did not weigh these factors equally. Rather, the "organizational experience" factor was weighted

significantly more than "past performance," which in turn was more important than "small business participation." AR 238.

Organizational experience considered the breadth, depth, and relevance of the offeror's experience since January 1, 2018, in four "key areas" identified in the RFP: (1) architecture research and design; (2) upgrades; (3) developmental testing; and (4) application integration and development. AR 232, 239.[5] The Solicitation clarified that these key areas did not constitute sub-factors that would be rated separately. AR 238. Instead, an adjectival rating for organizational experience was assigned "based on the *overall* evaluation of all key areas." *Id.* (emphasis added); *see also* AR 51 ("The [organizational experience] factor rating is based on the offeror's *collective demonstration* of relevance, breadth and depth of experience across all submitted references. Each Key Area is not a sub-factor."). The Source Selection Plan defined these adjectival ratings as follows:

| Rating | Definition |
|---|---|
| *Outstanding* | Proposal demonstrates exceptional experience and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low. |
| *Good* | Proposal demonstrates thorough experience and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate. |
| *Acceptable* | Proposal demonstrates adequate experience, and risk of unsuccessful performance is no worse than moderate. |
| *Marginal* | Proposal has not demonstrated adequate experience, and/or risk of unsuccessful performance is high. |
| *Unacceptable* | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of unsuccessful performance is unacceptably high. |

AR 52. Offerors that received a rating of "Marginal" or lower would not be considered for award. AR 239.

For the past performance factor, the Navy looked to the references cited in the organizational experience matrix and assessed "the offeror's probability of meeting the solicitation requirements" by considering the offeror's "demonstrated recent and relevant record of performance in supplying products and services that meet the contract's requirements and, specifically, in the Key Areas." AR 239. The RFP established three aspects to the past performance evaluation: (1) recency, (2) relevancy, and (3) overall quality. AR 239-40.[6] Based on the combined assessment of these three aspects,

---

[5] The first three of these key areas relate to "systems engineering" experience. AR 232.

[6] Only work considered "recent", *i.e.*, work performed since January 1, 2018, would be evaluated for relevancy and overall quality. AR 239. An offeror's recent work was deemed "relevant" if it was "similar to the kinds of challenges that may occur under the contract contemplated by the

the Navy assigned a performance confidence assessment rating for each offeror using the following scale: Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, and No Confidence.  AR 241.

The remaining technical factor evaluated the total percentage of small business participation.  AR 241.  Adjectival ratings were assigned based on the various thresholds of small business participation.  *Id.*

*Third,* the Navy evaluated "the estimated cost and proposed fee of each offer for realism and reasonableness in accordance with [Federal Acquisition Regulation ("FAR")] Subpart 15.4"[7] and as described in the Solicitation.  AR 241.  Per the RFP, the cost realism evaluation served three purposes:  (1) to verify the offeror's understanding of the RFP's requirements; (2) to assess "the degree to which the cost/price proposal reflects the approaches and/or risk assessments made in the proposal as well as the risk that the offeror will provide the supplies or services for the offered price/cost"; and (3)  to assess the degree to which the cost/price proposal "accurately represents the work effort included in the proposal."  AR 242.

*Fourth,* and finally, the Navy conducted a trade-off analysis to determine which offeror would provide the best value to the government.  AR 243.   The Solicitation required the Navy to compare "all offerors under consideration for award by trading off the differences in the non-cost factors against the difference in most probable cost and proposed fee between the offerors."   *Id.*   The Solicitation provided that the non-cost technical factors, when combined, were "significantly more important than cost," but that "the degree of importance of cost will increase with the degree of the equality of proposals in terms of the non-cost evaluation factors."  AR 238.

### B.  The Navy's Proposal Evaluations and CANES Contract Award Decision

The Navy received proposals from Noblis and Solute in response to the CANES RFP prior to the December 18, 2023, due date.  AR 1180, 1189.  On March 13, 2025, due to

---

RFP, specifically in the Key Areas," with respect to "complexity, length of performance, number of tasks, scope, type of work, and value."  AR 240.  Only recent work deemed at least "Somewhat Relevant" was evaluated for the third aspect, overall quality and usefulness, which considered factors like conformance to contract requirements, timeliness of performance, cost control, management, utilization of small business and regulatory compliance.  *Id.*

[7] The FAR is located at 48 C.F.R. ch. 1.

delays in the technical evaluation process, the Navy requested updated cost proposals from both offerors. AR 888, 889. On March 28, 2025, both Noblis and Solute submitted revised cost proposals. AR 890, 962.

The Navy's Business Clearance Memorandum — which constituted the agency's Source Selection Decision Document ("SSDD") — summarized the offerors and their ratings as follows:

| Offeror | Acceptability of the Offeror | Organizational Experience | Past Performance | Small Business Participation | Total Proposed Cost | Total Evaluated Cost |
|---|---|---|---|---|---|---|
| Noblis | Acceptable | Outstanding | Substantial Confidence | Outstanding | $109,978,079.20 | $109,978,079.20 |
| Solute | Acceptable* | Outstanding | Substantial Confidence | Outstanding | $102,557,997 | $102,557,997.00 |

AR 1189.

The SSDD explained that because "both offerors received a rating of 'Outstanding' for Organizational Experience, a rating of 'Substantial Confidence' for Past Performance, and a rating of 'Outstanding' for Small Business Participation," the two offerors were determined to be "essentially equal" in terms of the non-cost evaluation criteria.[8] AR 1226. Cost therefore became the deciding factor. AR 1227. Faced with "essentially equal technical proposals," the Source Selection Authority ("SSA") reasoned that paying a 7% premium — an additional $7,420,082 — for Noblis's proposal was not worth it; Solute's proposal was thus "determined to be the best value to the government." *Id.* On May 23, 2025, the Navy informed Noblis that its proposal was not selected for award. AR 1238.

---

[8] In response to a question Noblis posed in its post-award debriefing, the Navy explained its rationale for the "essentially equal" determination:

> The basis of the Agency's conclusion that Noblis and Solute were essentially equal beyond their adjectival rating, was determined by the fact that both companies provided references/contracts that their collective proposed contract team executed work that demonstrated each offeror's experience in each Key Area and that each offeror has been confronted with the kinds of challenges they would likely face under the contract contemplated by the solicitation. In addition, each reference/contract was deemed recent, very relevant, and had satisfactory or better in each past performance area which gave the evaluators "Substantial Confidence" that both offerors would successfully perform the required effort. Lastly, both companies proposed a contracting team that was above the 20% threshold to receive an "Outstanding" for Small Business Participation.

AR 1357.

In accordance with FAR 15.506, Noblis requested a post-award debrief, which the Navy provided on May 28, 2025.  AR 1240, 1241.  Noblis then submitted questions in response to the debrief, which the Navy answered on June 3, 2025.  AR 1351-62.

### C.  Noblis's GAO Protest

On June 6, 2025, Noblis filed a protest with the Government Accountability Office ("GAO"), challenging the Navy's "materially flawed" award to Solute.  AR 1363.  Noblis argued that the Navy:  (1) improperly refused to consider Solute's negative past performance that was "too close at hand" and thus misevaluated its past performance rating; (2) erroneously relied "solely on adjectival ratings" in its best value trade-off analysis; and (3) failed to perform a reasonable cost realism analysis with respect to one of Solute's proposed subcontractors, Booz Allen Hamilton.  AR 1363-64.

On June 25, 2025, the GAO dismissed Noblis's cost realism argument as speculative, but declined to dismiss Noblis's past performance and best value challenges. AR 1926.  On July 14, 2025, Noblis filed supplemental protest grounds, reasserting its cost realism argument.  AR 1855.

On September 11, 2025, the GAO denied the protest on all grounds.  AR 1928.  The GAO found "no basis in the record … to conclude that the [Navy's] judgment was clearly unreasonable" with respect to its assessment of Solute's experience, AR 1934, and refused to disturb the Navy's conclusion that the two proposals were "essentially equal."  AR 1938 ("[W]e cannot conclude that the agency erred by concluding that the two proposals were essentially technically equal, and that cost was the most significant discriminator between the two proposals." (citations omitted)).

### D.  Noblis's Bid Protest in this Court

On October 1, 2025, following its unsuccessful GAO protest, Noblis filed its complaint in this Court.  ECF No. 1 ("Compl.").  On November 5, 2025, Noblis filed its motion for judgment on the administrative record.  ECF No. 39 ("Pl. MJAR").  In its complaint and MJAR, Noblis asserts that:  (1) the Navy failed to conduct a proper cost realism analysis, Compl. at ¶¶ 91-93, 117; Pl. MJAR at 15-23;[9] (2) the Navy's evaluation

---

[9] The cost realism challenge Noblis includes in its complaint differs from those Noblis developed in its MJAR.  In its complaint, Noblis alleges that the Navy's cost realism analysis was irrational because it "failed to accurately assess the cost impact of Solute's subcontractor, [Booz Allen

of Solute's organizational experience as "Outstanding" was unreasonable and inconsistent with weaknesses identified by the agency's evaluators, Compl. at ¶¶ 56, 57; Pl. MJAR at 23-28; and (3) the Navy improperly assigned Solute a "Substantial Confidence" rating for past performance, erroneously crediting it with the work of its parent corporation and despite the Navy's alleged knowledge of Solute's recent failed performance under a different contract, Compl. at ¶80; Pl. MJAR at 28-33. Noblis also requests a permanent injunction, Pl. MJAR at 7, but nowhere addresses the prerequisite injunctive relief factors.

On November 21, 2025, the government and Solute filed their respective cross-MJARs and responses. ECF No. 44 ("Def. MJAR"), ECF No. 43 ("Solute MJAR"). On December 2, 2025, Noblis filed its response and reply. ECF No. 45 ("Pl. Rep."). On December 9, 2025, the government and Solute filed their respective replies. ECF No. 47 ("Def. Rep."), ECF No. 46 ("Solute Rep."). On January 29, 2026, this Court held oral argument on the parties' pending motions. ECF No. 54 ("Tr.").

## II.    JURISDICTION AND STANDING

This Court has jurisdiction over procurement challenges pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870. *See* 28 U.S.C. § 1491(b). The Tucker Act vests this Court with

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

---

Hamilton], which, based on publicly available information, has hourly rates well above $120 an hour for the work at issue – rates that are higher than Noblis' rates." Compl. at ¶ 117. Noblis abandons this argument in its MJAR. Instead, Noblis focuses its cost realism argument on a locality adjustment Noblis claims the Navy should have performed, arguing that "the Navy critically miscalculated by assuming that the actual payroll records of Solute's current employees were reasonable for Solute's proposed performance of 90% of the work in San Diego[.]" Pl. MJAR at 15-16. Neither the government nor Solute objected to Noblis's swapping in a new argument in its MJAR.

28 U.S.C. § 1491(b)(1).  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

No party challenges either this Court's jurisdiction or Noblis's standing to pursue its case.  Nevertheless, this Court has an independent duty to verify that it has jurisdiction over this matter and that Noblis has standing to pursue its action.  Here, this Court finds that it does have jurisdiction, and that Noblis has standing:  Noblis was an actual offeror, as it submitted a timely proposal before the RFP's deadline.  Further, Noblis alleges facts that, if proven, demonstrate that but for the Navy's errors, Noblis would have had a substantial chance at being awarded the CANES contract.  *REV, LLC v. United States*, 91 F.4th 1156, 1164 (Fed. Cir. 2024) ("In assessing whether a party was prejudiced [for standing purposes] by purported errors in a procurement process, we must assume that the party will, if permitted to proceed with its claim, prevail on the merits."); *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 567–68 (2021); *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 687 (2022).

Accordingly, this Court will proceed to the merits of Noblis's procurement challenge.[10]

## III.    STANDARD OF REVIEW

### A.  Administrative Procedure Act ("APA") Review in Bid Protest Cases

Pursuant to 28 U.S.C. § 1491(b)(4), this Court reviews bid protest cases using the standard of review from the APA § 10(c), 5 U.S.C. § 706(2)(A), and considers a challenged agency procurement decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Nat'l Gov't Servs., Inc. v. United*

---

[10] This Court considers prejudice at both the standing and merits stages of a case:

> For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions.  But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence.

*Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226–27 (Fed. Cir. 2019) (internal citations omitted).

*States*, 923 F.3d 977, 981 (Fed. Cir. 2019) ("In reviewing a grant of judgment upon the administrative record, . . . we review the agency's actions according to the standards set forth in the Administrative Procedure Act."); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("[W]hen read together, [28 U.S.C. §] 1491(b)(4) and [5 U.S.C. §] 706(2)(A) compel the conclusion that section 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A).").

For a plaintiff to succeed on the merits in a bid protest, it must first demonstrate, at a minimum, that either: "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (explaining that the APA standard of review requires a court to determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure" (quoting *PGBA*, 389 F.3d at 1225)).

An agency's decision is arbitrary and capricious — or lacks a rational basis — where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, this Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," though it will "not supply a reasoned basis for the agency's action that the agency itself has not given." *Snyder v. McDonough*, 1 F.4th 996, 1005 (Fed. Cir. 2021) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)); *see also Harrington v. Dep't of Veterans Affs.*, 2025 WL 655546, at *3 (Fed. Cir. Feb. 28, 2025) ("'[W]e do not require perfect explanations,' and 'we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382–83 (Fed. Cir. 2016))).

But a plaintiff must do more than simply show *some* agency error; the plaintiff must also demonstrate that the agency's error was prejudicial. "[T]here is no starting point of presumed prejudice[.]" *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997–98 (Fed. Cir. 2021) ("[T]he challenger of agency action generally bears the burden of

12

showing that an error was harmful — that is, that it was prejudicial."); *see also Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Accordingly, this Court must always determine whether an agency's error is prejudicial "before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation*, 22 F.4th at 997 (citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 n.6 (Fed. Cir. 2021) ("The APA does not provide an exception to the prejudicial-error rule for arbitrary and capricious action.")).

Our appellate court — the United States Court of Appeals for the Federal Circuit — has explained that, to prove prejudice, a plaintiff "must show there is a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). In that regard, a plaintiff must demonstrate "more than a bare possibility of receiving the award." *Blue Water Thinking, LLC v. United States*, 2025 WL 763565, at *9 (Fed. Cl. Mar. 11, 2025) (quoting *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016)); *see also Bannum*, 404 F.3d at 1358 (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award because its "argument rest[ed] on mere numerical possibility, not evidence").

## B. A Trial on the Administrative Record Requires this Court to Engage in Fact Finding, Including for the Prejudice Analysis

Procurement challenges pursuant to 28 U.S.C. § 1491(b) are resolved via motions for judgment on the administrative record, RCFC 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356. The process is "designed to provide for trial on a paper record, *allowing fact-finding by the trial court.*" *Id.* (emphasis added).[11] In deciding cross-MJARs, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed.

---

[11] "The primary difference between a typical trial and one conducted on the administrative record is that, in the latter, new evidence ordinarily may not be considered. Both the nature of APA review and this Court's rules 'restricts the evidence to the agency record, as may be supplemented consistent with [the law of this circuit].'" *Superior Waste Mgmt. LLC*, 169 Fed. Cl. at 274 (alteration in original) (quoting *Bannum*, 404 F.3d at 1356).

Cir. 2020) (quoting *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).[12]

The Federal Circuit has stated that this Court is "*required* to determine" whether "errors in the procurement process significantly prejudiced [the plaintiff]," *Bannum*, 404 F.3d at 1353 (emphasis added). Thus, the trial court must "make factual findings on prejudice from the record evidence." *Id.* at 1356. In other words, when performing the mandatory prejudice analysis, this Court performs its ordinary fact-finding role and does not defer to the agency. Therefore, the Federal Circuit "reviews such [factual] findings [only] for clear error." *Id.* at 1354; *see also Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1319 (Fed. Cir. 2025) ("Prejudice is a factual question that we review for clear error." (quoting cases)); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024) ("We review determinations of standing under the Tucker Act de novo. However, underlying factual findings, including prejudice, are reviewed for clear error." (citations omitted)); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) ("We review the legal standard for prejudice articulated by the Claims Court de novo, and we review the Claims Court's underlying factual findings for clear error." (citing *Bannum*, 404 F.3d at 1353–54)).[13]

---

[12] *See also Noble Supply & Logistics LLC v. United States*, 168 Fed. Cl. 439, 447 (2023) ("[T]he court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record." (citing *Bannum*, 404 F.3d at 1355)); *Navarre Corp. v. United States*, 168 Fed. Cl. 361, 367–68 (2023) (explaining that "the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record" and "will then determine whether a party has met its burden of proof based on the evidence in the record" (citing *Bannum*, 404 F.3d at 1354–55)); *Karthik Consulting, LLC v. United States*, 168 Fed. Cl. 95, 103 (2023) ("The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision.").

[13] *See also Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020) ("Prejudice is a question of fact that we review for clear error." (citing *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1359 (Fed. Cir. 2018)); *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 225 (Fed. Cir. 2019) ("Prejudice is a question of fact, and we review the findings of the Court of Federal Claims thereon for clear error."); *Diaz v. United States*, 853 F.3d 1355, 1359 (Fed. Cir. 2017) ("Prejudice is a factual question that we review for clear error." (citing *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1357–58 (Fed. Cir. 2015))); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) ("Unlike other issues in this case, prejudice is a question of fact that this court reviews for clear error.").

## IV.    SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD

### A. Legal Standard for Supplementation or Consideration of Extra-Record Evidence

As explained *supra*, this Court resolves actions pursuant to 28 U.S.C. § 1491(b) via motions for judgment on the administrative record, RCFC 52.1. That process differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *Bannum*, 404 F.3d at 1355–57. Indeed, we examine whether an agency, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. The trial court then makes factual findings based on the evidence in the record. *Bannum*, 404 F.3d at 1357. *Bannum* thus "teaches that two principles commonly associated with summary judgment motions—that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party—do not apply in deciding a motion for judgment on the administrative record." *Zappley v. United States*, 135 Fed. Cl. 272, 276 (2012). "Rather, such questions must be resolved by reference to the administrative record, as properly supplemented—in the words of the Federal Circuit, 'as if [the Court of Federal Claims] were conducting a trial on [that] record.'" *Zappley*, 135 Fed. Cl. at 276–77 (quoting *Bannum*, 404 F.3d at 1354, and citing *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005)).

While the government's overall "conduct" — *i.e.*, its "procurement decision" — is subject to the "'arbitrary and capricious' standard of [the APA,] § 706," *Bannum*, 404 F.3d at 1351 (discussing 5 U.S.C. § 706(2)(A)), "[t]he substantial evidence standard of 5 U.S.C. § 706(2)(E) 'applies to the trial court's review of agency findings.'" *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) (quoting *Bannum*, 404 F.3d at 1357 (citation omitted)). This Court, however, may "make[] factual findings from the administrative record in the first instance . . . 'like any finding in a bench trial.'" *Blue & Gold Fleet*, 492 F.3d at 1312 (quoting *Bannum*, 404 F.3d at 1357, and noting that the Federal Circuit "reviews such findings for clear error," *id.*).[14] Plaintiff bears the "'burden of proof

---

[14] *See also Young v. United States*, 497 F. App'x 53, 59 n.8 (Fed. Cir. 2012) (noting that the Court of Federal Claims "may make factual determinations and legal conclusions based on the administrative record in the first instance" while the Federal Circuit "reviews such factual determinations for clear error and legal conclusions without deference"); *but see Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (explaining that "'when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate

15

based on the evidence *in the record*.'"  *Palantir*, 904 F.3d at 989 (emphasis added) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum*, 404 F.3d at 1356)).

Unlike a typical, full bench trial — which, of course, consists of live testimony and is preceded by a robust discovery process — the trial court in an action pursuant to 28 U.S.C. § 1491(b) is far more constrained in what evidence the Court may receive and consider.  *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). Indeed, the statutorily prescribed standard of review drives the more limited nature of the available "trial" process, as well as the contours of the administrative record. As Judge Wolski has explained, "an agency does *not* possess the discretion to make these records whatever it says they are." *East West, Inc. v. United States*, 100 Fed. Cl. 53, 56 (2011) (emphasis added) (quoting *Orion Int'l Techs.*, 60 Fed. Cl. at 343 n.9, and citing *Tauri Grp., LLC v. United States,* 99 Fed. Cl. 475, 480–81 (2011)).  Instead, when the United States Supreme Court instructs that the trial court is to evaluate the "administrative record already in existence," *Camp v. Pitts,* 411 U.S. 138, 142 (1973), that refers to and "depends on what the agency did in reaching its decision, not what it chooses to assemble after a protest is lodged." *East West, Inc.*, 100 Fed. Cl. at 56 (quoting *Tauri Grp.*, 99 Fed. Cl. at 480–81).  "This record will normally include the information relied upon by the relevant agency decision makers and their advisers in reaching the decisions being challenged, and the *contemporaneously articulated reasons* for these decisions." *Id.* (emphasis added).[15] Implementing that idea, this Court's Rules provide detailed guidance on what documents typically should be included in the administrative record.  RCFC App. C, ¶¶ 21–24.

But what is a plaintiff supposed to do when it is dissatisfied with the scope of the record the government has constructed and filed, or when — perhaps as in this case — the record necessarily lacks relevant documentation given the nature of the specific

---

tribunal'" such that "'[t]he entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action'" (quoting *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001), and *Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993))).

[15] *Tauri Grp.*, 99 Fed. Cl. at 480–81 (rejecting the government's "opinion that the administrative record is whatever it says it is, regardless of whether this informal compilation of materials contains all of the information relied upon by the agency in reaching the challenged decision" but concluding that "the administrative record need not consist of every single document related in any way to the procurement in question, [and] may be reasonably limited to materials relevant to the specific decisions being challenged").

16

claims at issue?   In such circumstances, a plaintiff typically files a motion to add documentation to the record the Court will review.  Such motions can be categorized into two buckets: (1) "[s]upplementing the administrative record in an APA case means adding material to the volume of documents the agency considered;" and (2) "admitting extra-record evidence means adding material outside of or in addition to the administrative record that was not necessarily considered by the agency."  *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 4 (D.D.C. 2015) (citing *Pac. Shores Subdiv. Cal. Water Dist. v. U.S. Army Corps of Eng'rs,* 448 F. Supp. 2d 1, 5 (D.D.C. 2006)); *see SOSS2, Inc. v. United States Army Corps of Eng'rs,* 403 F. Supp. 3d 1233, 1237 (M.D. Fla. 2019) ("To supplement the administrative record means to permit review of material that the agency considered but failed to include.").[16]  In deciding Noblis's motion to supplement, Pl. Rep. at 10-14, this Court applies the standards previously articulated, and explained at length, in *Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 175-182 (2021), and *Superior Waste Mgmt. LLC*, 169 Fed. Cl. at 279-80.

## B.  This Court Rejects Noblis's Proffered Extra-Record Evidence

Noblis's MJAR relied on nearly 120 pages of extra-record evidence, *see* ECF No. 39-1, not contained in the administrative record, ECF Nos. 33, 37, 40.  Nor could the government have included those documents: Noblis's expert developed them for the sole purposes of critiquing the Navy's cost realism analysis.  The problem here, amongst others, is that Noblis did not file a timely motion either to supplement the administrative record, or for this Court to consider Noblis's extra-record evidence.  Instead, Noblis proceeded on the assumption that this Court must (or would) consider Noblis's extra-record evidence.  And just as night follows day, Solute and the government object to Noblis's approach.  Solute urges this Court to "consider the procedural violations in Noblis's presentation of its case," correctly asserting that "Noblis does not even try to explain why it thinks these materials satisfy Federal Circuit precedents for supplementation of the procurement record."  Solute MJAR at 13.  The government makes substantially the same argument, but at greater length.  Def. MJAR at 20-23.

---

[16] In *Axiom*, the Federal Circuit all but equated the term "supplementation" with the phrase "extra record evidence."  564 F.3d at 1380 (holding that "supplementation of the record should be limited to cases in which 'the omission of *extra-record evidence* precludes effective judicial review'" (emphasis added) (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).

This Court agrees with Solute and the government.  Noblis eventually moved to supplement the record in its reply brief, Pl. Rep. at 10-14, but that is far too late.  Although this Court was unable to locate any Rule of this Court or case imposing a strict time limit on when such a motion to supplement or to admit extra-record evidence must be filed, this Court can safely say that a reply brief will almost always be too late — and it certainly is in this case.  This Court's scheduling order provided a due date for the administrative record and for the subsequent filing of the parties' MJARs.  MJARs, by definition, require the parties to know what evidence this Court will consider — and, thus, what evidence the parties may rely upon — and what is out of bounds.  At least by the time of the defendants' respective MJARs, all the parties should know what is in the administrative record and what is not.  *Cf.* RCFC App. C, ¶ 25 (requiring the parties to meet and confer to discuss the administrative record).

Here, for whatever reason, Noblis assumed the risk of basing its primary argument on a host of extra-record materials — including an expert declaration and analysis, as well as backup data for that analysis — without having ensured that those materials were properly before this Court.  Perhaps Noblis attempted to pitch a fastball, assuming that it could slide those materials past the parties (and this Court), or hoped that the defendants just would not care.  Or perhaps Noblis figured it wasn't worth the space in its MJAR to include a motion to supplement, or that it wasn't worth the time to draft and file a separate motion along with its MJAR.  But no matter the rationale for Noblis's chosen course, it was a strategic error.  Permitting Noblis to move to supplement the administrative record in its reply brief — without any sort of excuse for the delay — would set a bad precedent: future plaintiffs would be incentivized to avoid time and possibly page limitations, all while effectively moving the burden to the government (and any defendant-intervenor) to oppose the admission of the extra-record evidence.  But that would invert the parties' burdens.  The party seeking to add material to the administrative record, or to otherwise have this Court consider extra-record evidence, has the burden to demonstrate to this Court why it should depart from its default rule.  Inverting the burdens in the manner Noblis implicitly suggests here makes little sense, and this Court declines to do so.  Noblis's motion to supplement the administrative record is **DENIED**.

In the alternative, this Court concludes that Noblis's proffered extra-record materials are relevant, at most, only to the question of prejudice.  In other words, even if Noblis had timely filed its motion, this Court would still not consider the proffered documentation to support the merits of Noblis's challenge to the Navy's cost realism

analysis. That is because a plaintiff generally cannot demonstrate that an agency's approach to some analysis is unreasonable, or arbitrary and capricious, merely by pointing to an alternative method of analysis, even if that analysis is superior in some way (*e.g.*, it would have yielded a more accurate result). Put differently, the fact that Noblis's expert came up with an alternate — and, for the sake of argument, better — analysis, does not mean that the Navy's chosen approach is unreasonable. *See Medart, Inc. v. Austin*, 967 F.2d 579, 581–82 (Fed. Cir. 1992) (holding that plaintiff's proposed estimating procedures "might have improved the accuracy of the government estimates, but their mere existence does [] not mean the approach selected [by the government] was not reasonable").

On the other hand, if Noblis were able to demonstrate that the government's approach is erroneous (or arbitrary and capricious) based on the existing administrative record — without regard to a comparatively superior analysis, whatever that might be — the question of prejudice would remain: did the government fail to adjust Solute's projected cost upward in a manner and to a degree that would call into question the Navy's ultimate best value judgment? And to answer *that* question, an expert's calculation and opinion might well prove helpful (*i.e.*, in quantifying the degree of the Navy's hypothetical error). Moreover, that type of calculation is precisely the sort of thing that no one would expect to find in the record (as the government evaluators are not in the habit of producing alternative calculations based on conclusions they did not reach). Nor, for that matter, would this Court expect that proof of prejudice is always to be found within the government's administrative record. *See, e.g., FirstLine Transportation*, 116 Fed. Cl. 324, 326–27 (2014) (permitting expert declaration that "does not substitute [his] judgment for the agency's judgement" but rather "makes calculations based on data already contained in the administrative record, so that the Court can better understand the record"). As discussed below, however, this Court does not reach this issue because the government's approach to cost realism complied with the Solicitation and, thus, is not arbitrary, capricious, or otherwise contrary to law.[17]

Accordingly, even if Noblis's had filed its motion to supplement the record in a timely manner, and even if this Court had granted the motion to the extent the extra-

---

[17] At oral argument, both the government and Solute agreed to the admission of the extra-record evidence for the limited purpose of determining the extent of any prejudice. *See* Tr. 46:19-21 ("For that purpose, yes, the United States does not take issue with consideration along those lines."); Tr. 50:12-13 (Solute's agreeing that it does "not object to the use of the expert report for the calculation of prejudice").

record evidence might prove useful to assess prejudice, this Court would still not have ultimately considered Noblis's extra-record evidence.

**V.   DISCUSSION – THIS COURT FINDS THAT THE GOVERNMENT COMMITTED PREJUDICIAL ERROR BUT DECLINES TO AWARD INJUNCTIVE RELIEF BECAUSE NOBLIS DIDN'T PROPERLY SEEK IT**

Noblis launches a three-pronged attack on the government's decision to award the contract to Solute.  First, Noblis asserts that the Navy conducted an irrational cost realism analysis of Solute's proposal.  Pl. MJAR at 15.  Second, Noblis argues that the Navy improperly disregarded certain risks it identified in Solute's organizational experience. *Id.* at 23-24.  Third, Noblis contends that the Navy's past performance evaluation of Solute is erroneous or arbitrary and capricious.  *Id.* at 33.  According to Noblis, any one of these errors sufficiently infects the Navy's resulting best value decision such that it must be set aside.  *Id.* at 7.

This Court rejects all of Noblis's arguments, except for its past performance challenge where this Court agrees with Noblis on very narrow grounds.  Despite succeeding on the merits, however, Noblis gains nothing at this stage, as there is no basis for this Court to order permanent injunctive relief.  This Court reserves, however, the question of whether Noblis should be awarded bid and proposal costs.

**A. The Navy's Cost Realism Analysis Complied with the FAR, Adhered to the Terms of the RFP, and Was Rational**

Noblis's primary argument challenging the Navy's cost realism analysis of Solute's proposal focuses on "Solute's failure to document the current locations of its proposed personnel."  Pl. MJAR at 23.  Noblis asserts that the Navy's "reliance on Solute's cost data based on the employee's current salaries was unreasonable, arbitrary, capricious, an an abuse of discretion, and prejudiced Noblis."  *Id.*  This Court disagrees with Noblis's characterization of the Navy's cost realism analysis.  The Navy's cost realism evaluation complied with the applicable FAR provisions, adhered to the terms of the RFP, and was rational.

**1. Cost realism analysis pursuant to FAR 15.404-1.**

The FAR defines a "[c]ost realism analysis" as:

> [T]he process of independently reviewing and evaluating specific elements of each offeror's cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

FAR 15.404-1(d)(1); *see IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 301 (2022) ("There are two main purposes of a cost realism analysis: (1) 'to prevent offerors from gaining an advantage over competitors by proposing an unrealistically low estimated cost'; and (2) 'to determine whether offerors understand the contract requirements.'" (quoting *VS2, LLC v. United States*, 155 Fed. Cl. 738, 759 (2021))); *Warrior Focused Sols., LLC v. United States*, 175 Fed. Cl. 416, 432 (2025) ("In essence, a cost realism analysis determines whether a proposed cost is too low and thereby increases the risk of overcharging." (first citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1305 (Fed. Cir. 2021); and then citing *Agile Def. Inc. v. United States*, 959 F.3d 1379, 1384 (Fed. Cir. 2020))).

Where, as here, an agency solicits proposals for a cost-reimbursement contract, it must conduct a cost realism analysis "to determine the probable cost of performance for each offeror." FAR 15.404-1(d)(2). "Probable cost" reflects "the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal" and is "used for purposes of evaluation to determine the best value." FAR 15.404-1(d)(2)(i). It is "determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis." FAR 15.404-1(d)(2)(ii).

This Court's "scope of review of an agency's cost realism determination is very narrow." *McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 236 (2016). To successfully challenge the agency's cost realism determination, "[a] plaintiff must establish that [the agency's decision] lacked a rational basis." *Id.* (quoting *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007)); *see also A-T Sols., Inc. v. United States*,

122 Fed. Cl. 170, 180 (2015) ("[T]he Court will not overturn a cost realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision." (citation omitted)).  "[A]n agency need not perform the analysis with impeccable rigor to be rational.  Rather, the cost realism analysis must reflect that the agency considered the information available and did not make irrational assumptions or critical miscalculations."  *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015) (internal quotations omitted).

Indeed, "contracting agencies enjoy wide latitude in conducting the cost realism analysis."  *Agile Def., Inc.*, 959 F.3d at 1385-86 (citing *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019), and refusing to "unduly circumscribe a contracting officer's discretion and hamstring a contracting agency's efforts").  Although the FAR "provides examples of cost analysis techniques," it "does not mandate the use of any specific methodology."  959 F.3d at 1386 (citing FAR 15.404-1(c)).  Rather, the FAR provides that "[t]he [g]overnment may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition."  FAR 15.404-1(c)(2); *see also* FAR 15.404-1 (providing that "the complexity and circumstances of each acquisition should determine the level of detail of the analysis required").

Contracting agencies retain this broad discretion regarding the "nature and extent" of a cost realism analysis, "unless the agency commits itself to a particular methodology in a solicitation."  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009).  It stands to reason that the converse is also true: when the solicitation specifies precisely what an offeror must provide to substantiate cost realism, and how the agency will consider that information, the solicitation necessarily cabins the cost realism requirement and this Court's review.  That is particularly true where a prospective offeror fails to challenge the controlling solicitation provision prior to the proposal due date.  *See Blue & Gold Fleet*, 492 F.3d at 1313 (holding that a challenge to a solicitation's terms is waived when a plaintiff failed to object before the proposal due date).

### 2. The CANES Solicitation's cost realism instructions and evaluation criteria.

The CANES Solicitation reflected the FAR's requirements for a cost realism analysis in numerous provisions.  Section M-2 ("Evaluation Criteria and Basis for Award"), for example, provides that "[t]he Government will evaluate the estimated cost and proposed fee of each offer for realism and reasonableness in accordance with FAR

22

Subpart 15.4 and as described [in the RFP]."   AR 241 (§ M-2, ¶ 3.0).   The Solicitation further provides:

> The purpose of this evaluation will be (a) to verify the offeror's understanding of the requirements; (b) to assess the degree to which the cost/price proposal reflects the approaches and/or risk assessment made in the proposal as well as the risk that the offeror will provide the supplies or services for the offered prices/cost; and (c) assess the degree to which the cost reflected in the cost/price proposal accurately represents the work effort included in the proposal.

AR 242 (§ M-2, ¶ 3.0).

Of particular significance here, the Solicitation in § L-2 ("Submission of Proposals") expressly directs offerors to "breakout and identify" direct labor costs, *i.e.*, "the various labor categories and individual names (if known) intended for use under this contract including the number of labor hours, hourly labor rates, total cost for each labor category proposed for each year of the contract, and the average bid rate by labor category for all years."   AR 222 (§ L-2, ¶ 2.1).   For individuals unknown at the time of the proposal, the Solicitation instructs that "for proposal purposes, assume they will be employed in the San Diego Area and list intended labor category with anticipated rates from ERI in the San Diego Area."   AR 223 (§ L-2, ¶ 2.1(a)).   The Solicitation further instructs, in that regard:   "Do **not** submit average or composite rates for named individuals."   *Id.* (emphasis in original).   In that same section, the Solicitation provides that "[i]n order to verify the realism" of the proposed direct labor costs, each offeror "shall submit documentation substantiating the accuracy of its proposed direct labor rates for all labor categories."   AR 229 (§ L-2, ¶ 2.7(c)).   Offerors that propose direct labor rates based on documentation outside of the specified sources of "acceptable documentation" and that are lower than the ERI rates "will be adjusted upward to the ERI rate during cost realism analysis."   AR 229-230 (§ L-2, ¶ 2.7(c)).   The first and second items on the list of "acceptable documentation" are, respectively, the "[m]ost recent payroll run (for named, current employees)" and "[c]opies of signed Letters of Intent that indicate agreed upon annual salary (for named, new hires)."   AR 229 (§ L-2, ¶ 2.7(c)).

### 3.   Noblis fails to demonstrate that the Navy's cost realism evaluation was inconsistent with the FAR's requirements or irrational.

Noblis objects to the Navy's cost realism analysis, arguing the agency "critically miscalculated by assuming that the actual payroll records of Solute's current employees were reasonable for Solute's proposed performance of 90% of the work in San Diego[.]" Pl. MJAR at 15-16.  Essentially, Noblis faults the agency evaluators for relying on the current payroll records and signed letters of intent Solute submitted with its proposal, AR 724-33 (Appendix B), as sufficient substantiation of direct labor cost realism.  Pl. MJAR at 17 ("The Navy irrationally accepted actual salary data as sufficient proof of the probable cost of performance in San Diego, without any consideration of the employee's current location or any basis for believing the existing salaries were representative of the cost of performance in San Diego.").  Instead, Noblis argues, the Navy should have performed a "locality adjustment" to "reflect the higher salaries necessary to attract and retain personnel for the cost of living in San Diego." *Id*. at 17-18.  Had it done so, Solute's total evaluated costs would have increased by 33%, or $7,738,817, thereby exceeding Noblis's evaluated costs by $318,734.  *Id.* at 18.[18]  Given that this is a best value procurement, and the non-cost factors of the two proposals were deemed equal, "Noblis would have been the awardee." *Id.*

But Noblis fails to demonstrate that the Navy's cost realism analysis violated the FAR, contradicted the terms of the RFP, or was irrational in any way.  Quite the opposite, in fact: the very premise of Noblis's argument contradicts the Solicitation and reflects a fundamental misunderstanding of its provisions.

First, and most importantly, nothing in the FAR or the RFP's terms mandates the use of Noblis's preferred cost realism methodology. *See Agile Def.*, 959 F.3d at 1386 (The FAR "does not mandate the use of any specific methodology.").  Moreover, in this case, the Solicitation explicitly circumscribes the cost realism evaluation process in providing that the actual salary data of named employees shall constitute sufficient proof of realistic direct labor costs.  AR 229 (§ L-2, ¶ 2.7(c)) (providing that "in order to verify the realism" of the proposed direct labor costs, offerors shall submit "[a]cceptable documentation," which includes the "[m]ost recent payroll run (for named, current employees)").[19]

---

[18] This Court accepts Noblis's calculation for the sake of argument.

[19] Likewise, the SSDD describes payroll actuals as "the next best source" of rate substantiation (after FPRR/FPRA data), "since the rate represents the current wage for [the] specialized labor that this effort requires."  AR 1205 (describing the SSA's "order of preference for evaluating

24

Nothing in the Solicitation requires the Navy to adjust direct labor rates for named employees to reflect San Diego-based wage data. *See* AR 223 (§ L-2, ¶ 2.1(a)) (instructing offerors to assume "for proposal purposes" that individuals *unknown* as of proposal submission "will be employed in the San Diego Area," but prohibiting the submission of "average or composite rates for *named* individuals" (emphasis added)).

Second, Noblis knows better. Before the proposal due date, the Navy rejected Noblis's reading of the RFP's cost realism requirements. In response to a question posed by Noblis, the Navy declined to amend the Solicitation to require that all named personnel be based in San Diego and listed with San Diego-based compensation rates. AR 426; AR 3145-46 (question 4). Noblis asked as follows: "To ensure that compensation levels are in accordance with the geographic area in which they are to be performed, would the Government consider adjusting this section to also note that, 'If Individuals are known at time of the proposal, the proposed named personnel should be based in San Diego'?" AR 426. The government responded in the negative. *Id.* ("The Government is not adjusting this section.").

Agency "answers to bidder questions amend[] the solicitation." *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 689 n.15 (2012); *see also Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016) ("[T]he questions and answers posed during an agency solicitation . . . play a central role in the interpretation of the solicitation provisions."). At a minimum, such Q&As put offerors on notice of the government's reading of the Solicitation. As a practical matter, that means that Noblis's argument is untimely. *Blue & Gold Fleet*, 492 F.3d at 1313 ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). At this point, Noblis simply cannot object to the Navy's failure to perform a locality adjustment as part of its cost realism evaluation. The Navy had rejected its request for that adjustment at outset of the procurement process, and Noblis neglected to challenge the RFP's terms before submitting its proposal.

Third, the rationale for Noblis's requested locality adjustment — its assertion that "90% of personnel proposed would need to be located in San Diego, CA to perform the

---

realism of direct labor rates," and indicating that "in cases where the FPRR/FPRA were not available, offeror-submitted payroll actuals will be utilized").

contract work," Pl. MJAR at 16 — is rooted in its flawed understanding of the RFP's requirement with respect to overhead costs. In § L-2, the Solicitation directs offerors "with different indirect rates for Government and contractor facilities" to "[p]ropose on-Government-site overhead rates (i.e., rates associated with performance at Government facilities) for 90% of the level of effort for each labor category." AR 223 (§ L-2, ¶ 2.1(c)). Noblis reads this as a geographical requirement: that 90% of proposed personnel must be "onsite" in San Diego, CA. Pl. MJAR at 16. As Solute correctly points out, however, "[t]his instruction does not distinguish between work locations in San Diego and work locations elsewhere; it distinguishes between overhead at a Government facility (where overhead rates are typically low) and overhead at a contractor-owned facility (where overhead rates are typically higher)." Solute MJAR at 17. And the Solicitation does not elsewhere require or even suggest that 90% of the personnel proposed for the contract must or will perform the work in San Diego; rather, the Solicitation indicates only that "[a]ll or a portion of the effort under this contract will be performed *on a Government installation*." AR 121 (§ C, NIWC Pacific PWS Addendum, II(a)) (emphasis added); *see also* AR 1205 ("Offerors were also instructed to assume that 90% of the effort would be performed on Government Site."). Indeed, the precise location of performance has not been specified yet. Consistent with the IDIQ nature of this contract, the Solicitation provides that the exact "[p]lace of delivery or performance" will be specified in individual task orders. AR 121 (§ C, NIWC Pacific PWS Addendum, I(b)(9));.[20] Noblis's reading of the RFP is plainly contrary to the clear and unambiguous Solicitation provisions.

In sum, the Navy's cost realism evaluation fully complied with express terms of the Solicitation. Contrary to Noblis's assertion, the very terms of the RFP directed the Navy to perform its analysis by relying on submitted payroll records and signed letters of intent. The Navy did just that. It accepted current payroll data as sufficient substantiation of direct labor cost realism, and evaluated the cost proposals of the two offerors accordingly, just as the Solicitation provided. AR 1203-06. Given the government's compliance with the Solicitation, this Court cannot deem the Navy's analysis inadequate.[21]

---

[20] In an RFP attachment, the Navy lists numerous potential "location(s)" of contract performance, including: the Naval Information Warfare Center in San Diego, CA; the Naval Information Warfare Center in Hanahan, SC; and aboard Navy ships in San Diego, CA, Norfolk, VA, Bremerton, WA, Jacksonville, FL, Pearl Harbor, HI, an Yokosuka, Japan. AR 244-45.

[21] Given this Court's rejection of Noblis's cost realism argument, we do not need to reach the prejudice issue. Nor does this Court reach Noblis's other cost realism arguments, which either amount to sums too small to be prejudicial, Pl. MJAR at 22 (Navy's adjustments should have been

**B. The Navy's Evaluation of Solute's Organizational Experience was Consistent with the Terms of the RFP and Rational**

Noblis's next attack on the Navy's award decision challenges the Navy's evaluation of Solute's organizational experience. Pl. MJAR at 23-28. The Navy assigned an "Outstanding" rating to Solute for the organizational experience evaluation factor. AR 1194. Noblis characterizes the Navy's assessment as "irrational because its recognition of the risks of Solute's inexperience[,] and its determination that such risks could lead to delays or nonfunctional applications, are not reflected in its factor level ratings or the SSDD." Pl. MJAR at 23-24. Noblis argues that the Navy "glossed over," in particular, the risks it identified in Solute's proposal under evaluation key area 4 (Application Integration and Application Development) and, in so doing, "effectively erased [the Navy's] recognition of the qualitative differences between Noblis'[s] and Solute's records of experience under the most important non-price factor . . . giving both Solute and Noblis an 'Outstanding' rating." *Id.* 24-25. Essentially, then, Noblis contends that because proposal evaluators recognized *some* risk in Solute's experience with respect to key area 4, the Navy's decision to assign Solute a rating of "Outstanding" for the technical factor as a whole is arbitrary and capricious. A simple review of the record thoroughly disproves this contention.

Pursuant to the Solicitation's evaluation requirements, the Navy evaluated the "breadth, depth, and relevance of offeror organizational experience" since January 1, 2018, in each of four "key areas." AR 239 (§ M-2, ¶ 2.1). These areas are: (1) Research and Design; (2) Upgrades; (3) Developmental Testing; and (4) Application Integration and Development. AR 232 (§ L-2, ¶ 3.1(a)).[22] As indicated in the Source Selection Board ("SSEB") Report, the Navy assigned an "Outstanding" rating for organizational experience to both Noblis and Solute. AR 1139; AR 1165. An "Outstanding" rating, per the RFP's definition, means that each "[p]roposal demonstrates exceptional experience and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low." AR 52; *see supra* Section I.A.2. The Navy's evaluators

---

"correctly calculated as a $676,132 cost increase"), or fail to quantify a cost impact altogether, *id.* at 19 (asserting that Solute "based the cost that it proposed to the Navy" on rates of its affiliates, which "creates the risk that these employees may not agree to perform and would require substitution upon award"). At oral argument, counsel for Noblis acknowledged that these "small cost" arguments, Tr. 5:12, "[did] not matter one way or the other" and need not be reached. Tr. 7:1-5.

[22] As noted above, *supra* n.5, the first three of these key areas relate to "systems engineering" experience. AR 232 (§ L-2, ¶ 3.1(a)).

found that Noblis had demonstrated "significant strengths" in all four key areas, whereas Solute had demonstrated "significant strength" in three of the key areas and "strength" in the fourth key area.  AR 1129-41; AR 1154-67.

The SSEB Report explains the rationale for the "strength" rating in the fourth key area.  With respect to Solute's first reference, the SSEB concludes: "the offeror did not demonstrate adequate experience with the types of challenges expected under this solicitation for CANES assessments and quantity of diverse applications from across Department of Defense."  AR 1162.  According to the evaluators, "because the offeror's experience does not indicate that it has covered the range of expected challenges anticipated for Application Integration and Application Development under the RFP," there is "some risk of unsuccessful performance."  *Id.*  With respect to the second reference, the SSEB assessed it "overall as demonstrating adequate experience," but notes that "due to the limited integration experience, there is risk that some of the applications requirements under this solicitation may not be adequately addressed[.]"  AR 1163.  The SSEB likewise assessed the third reference as "demonstrating adequate experience," but notes that "there is some risk to successful performance because the offeror's experience does not clearly demonstrate familiarity with technical documentation and functional specifications specific to CANES, which could potentially delay publication delivery and overall system implementation."  *Id.*

Although Solute did not receive a "significant strength" rating for the fourth key area, the Navy determined that:

> [Solute's] adequate experience in this [fourth] area indicates that [Solute] could successfully perform the contemplated effort with the potential need for minor assistance and ramp up from the Government to ensure that the applications that will leverage the CANES Tactical Networks for transport or services will be adequately integrated to reduce risk of poor performance when the system is fielded.

AR 1167.

Then, as the RFP required, the Navy performed a holistic evaluation of Solute's ratings in all four of the key areas — including the three "significant strengths" and one

28

"strength — and determined that "[t]he risk of unsuccessful performance is low." *Id.* The Navy concluded:

> Collectively, the proposal demonstrates exceptional experience and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low. Therefore, the rating for the organizational experience factor is Outstanding.

*Id.*

Noblis's argument that the Navy failed to "weigh the risks it had identified" and "'disappeared' such risks as if they never existed with the magic words, 'low risk,'" Pl. MJAR at 26, finds no support in the administrative record and, yet again, reflects a fundamental misunderstanding of the Solicitation's evaluation process. In short, Noblis's contention that the Navy's conclusion — *i.e.*, that Solute was deserving of an "Outstanding" rating for organizational experience — is "irrationally inconsistent with its underlying findings," Pl. MJAR at 27, amounts to nothing more than a mere disagreement with the Navy's judgment. *See Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably."(citation omitted)); *Croman Corp. v. United* States, 724 F.3d 1357, 1363-64 (Fed. Cir 2013) (affirming this Court's determination that "the agency had a rational basis for its action, notwithstanding [plaintiff's] arguments that simply amount to a mere disagreement with the wisdom of the agency's decision"); *Harmonia Holdings Grp., LLC v. United States*, 152 Fed. Cl. 97, 111 (2021) ("[Plaintiff protestor] may disagree with the agency's assessment, but such a disagreement does not allow a court to displace the reasoned and rational judgment of the agency.").

First, it is evident from the record, that the Navy evaluators did not in fact "gloss[] over" or "disappear[]" the risks identified in Solute's references for the fourth key area. Rather, and here is where Noblis's misunderstanding of the RFP's evaluation process becomes evident, the Navy documented those risks thoroughly in the SSEB report, AR 1154-67. The Navy then determined — as reflected in both the SSEB report and the SSDD — that "*collectively*," the proposal demonstrates the qualifications necessary to merit a rating of "Outstanding" for the organizational experience technical factor.   AR 1167

(emphasis added); AR 1197 (emphasis added).  In other words, both the evaluators and source selection officials agreed that the risks in one key area, when assessed together with all the other elements for this technical factor, presented a "low" risk overall.  AR 1167; AR 1197.  This evaluation was entirely consistent with the Solicitation, which mandated that "the rating for Organizational Experience will be based on the *overall* evaluation of all key areas."  AR 238 (§ M-2, (c)) (emphasis added).

Moreover, Noblis's assertion that "[b]oth significant strengths and strengths could only apply to instances with no risk revealed in any reference," Pl. Reply at 25, is plainly wrong.  The very definition of an "Outstanding" rating allows for some degree of risk, so long as that risk is coupled with "exceptional experience" as well as "multiple strengths and/or at least one significant strength."  AR 52.  It is simply not the case that an offeror had to be entirely risk-free to merit an "Outstanding" rating.  The Navy's evaluation of Solute's proposal as "low risk" overall is not undermined by the finding of some risk in one key area.  Rather, the Navy's "Outstanding" rating for Solute's organizational experience complied with the RFP and was rational.

Put simply, the Navy reasonably concluded that despite the risk present in one key area, the overall risk in Solute's organizational experience was low, and its proposal therefore merited an "Outstanding" rating for that factor.  Noblis may be disappointed with that assessment, but it "bears a heavy burden of showing that the award decision had no rational basis."  *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332–33 (internal quotations omitted).  Offering little more than "mere disagreements" with the Navy's conclusions, Noblis has failed to meet that burden here.  *IAP Worldwide Servs., Inc.*, 159 Fed. Cl. at 294 (describing Plaintiff's "mere disagreements" as "naked claims," which "fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious").

## C. The Navy's Evaluation of Solute's Past Performance Was Arbitrary and Capricious

This case presents yet another instance where this Court must wade through the FAR's labyrinthine approach to defining — or rather, *not* defining — various terms. One might expect that regulations governing the expenditure of billions of taxpayer dollars would provide clear, universal definitions for such fundamental concepts.  One would be wrong.

Here, Noblis asserts that Solute (and the Navy) effectively treated Solute's affiliated entity as part of Solute itself, but where the Solicitation precluded the Navy from considering the "past performance of affiliate companies who were not performing as subcontractors under the prime award." Pl. MJAR at 28. Although this sounds like a *per se* challenge to Solute's reliance on its affiliate's past performance, Noblis agrees that "an agency may generally consider affiliate past performance if there is nothing in the solicitation explicitly stating otherwise," so long as the proposal demonstrates that the "'resources of the parent or affiliated company will affect the performance of the offeror.'" *Id.* at 29 (quoting *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 193 (2014)). According to Noblis, however, Solute improperly relied on the past performance of its parent company, Sigma — and the Navy erroneously gave Solute full credit for the Sigma past performance reference[23] — because Solute's proposal fails to indicate "that Sigma's resources, personnel, or expertise will be made available to Solute in the performance of this contract." *Id.* Indeed, Noblis asserts, Solute's proposal "deliberately obscures the performing party when discussing Sigma's contract references, referring to Sigma as 'Team Solute' throughout the past performance volume." *Id.*

This Court agrees with Noblis, but these affiliate issues present perennial problems and so this Court writes at greater length to clarify the source of these problems, the general background rules, as well as the precise nature of the government's error here. In short, while the FAR meticulously defines "affiliates" and provides detailed guidance on "contractor team arrangements," the FAR somehow managed to avoid providing helpful and universal definitions for the very entities that form the backbone of federal contracting: contractors and subcontractors themselves. This definitional gap has spawned decades of controversies over a variety of issues for this Court and the GAO to resolve, including when and how agencies may consider the past performance of entities other than the offeror itself. The Court finds it necessary, therefore, to provide a comprehensive analysis of the regulatory framework before turning to the specific facts of this case.

---

[23] Solute's own past performance reference was rated "satisfactory." AR 1201. In contrast, Solute's two other past performance references — for Booz Allen Hamilton, a proposed subcontractor, and Sigma — were rated "exceptional." *Id.* Thus, this Court concurs with Noblis that "it is apparent that the two non-Solute references were what lead to [Solute's overall] 'Substantial Confidence' rating for past performance." Pl. MJAR at 30.

### 1.   What the FAR does and does not define.

How does the FAR define the terms "contractor" and "subcontractor"? Surely the FAR provides universal definitions for these foundational concepts that appear in virtually every section of the regulation? Alas, no. While FAR 2.101 defines many things — from "Acquisition" to "Economically disadvantaged women-owned small business concern" to "Earned value management system" — it does not provide standalone, universal definitions of "contractor" or "subcontractor." The term "contract" is defined, as is "contracting" and "contracting officer," but the actual party to the government contract is left in definitional limbo. To be sure, various FAR provisions use these terms such that contextual definitions may be inferred. But comprehensive, universally applicable definitions of "contractor" and "subcontractor"? Zilch. And while even grade school children are familiar with the premise that a dictionary cannot define a word using the same word, the FAR defines "Offeror" as "offeror or bidder." FAR 2.101

Now perhaps the FAR drafters assumed these concepts were too fundamental to require definition. After all, everyone knows that a "contractor" is the party to the contract with the government, and everyone knows that "subcontractors" are separate entities the contractor engages. But the absence of explicit definitions has led to endless confusion about what it means to "consider" or "credit" an offeror with the experience of its affiliates or proposed subcontractors — often called team members. The label "team member" is itself confusing because some offerors may include in their proposals affiliates or potential subcontractors, without any real commitment from those other entities to actually perform the resulting contract should the offeror be selected as the contract awardee. And that has a second order effect: offerors assume that because they control an affiliate or propose to use a subcontractor, they can claim that entity's past performance as their own. This assumption is wrong as a matter of both law and logic, but the FAR's silence on the basic definitions has not helped matters.

Let us begin with what the FAR actually defines. FAR 2.101 defines "Affiliates" as "associated business concerns or individuals if, directly or indirectly either one controls or can control the other; or third party controls or can control both." The very fact that the FAR defines "affiliates" as separate entities reveals a fundamental truth about federal contracting: *affiliates are not the offeror* during the procurement process, and *they are not the contractor* upon award.

FAR 9.601 defines "Contractor team arrangement" as "an arrangement in which (1) Two or more companies form a partnership or joint venture to act as a potential prime

32

contractor; or (2) A potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program." But subcontractors — entities with whom the prime contractor contracts to perform portions of the work — are similar to affiliates in at least one respect: they are *not* the contractor either. That is true even when the offeror — *i.e.*, the would-be prime contractor — intends to enter a subcontract with another company to perform part of the contract scope. And that is true whether the offeror's intent to enter a subcontract is memorialized in a binding teaming agreement with the potential subcontractor (governed by state law) during the proposal phase of the procurement or whether there is no formal arrangement at all.[24] Indeed, the FAR recognizes that while "[t]he companies involved normally form a contractor team arrangement before submitting an offer[,] … they may enter into an arrangement later in the acquisition process, *including after contract award*." FAR. 9.602(c) (emphasis added).

This all may seem obvious, but its implications are profound and frequently misunderstood.

### 2. The Iron Law of Privity: there can be only one contractor.

Here is the critical point that flows from the foregoing definitions: with limited exceptions not relevant here (*e.g.*, certain contractor team arrangements involving partnerships or unincorporated joint ventures), there can be only one entity in privity of contract with the government. That entity is the offeror, which becomes the contractor (singular) when it is awarded the contract.[25] Thus, the FAR provides that the government

---

[24] Michael W. Mutek, *Close Enough for Government Work: The Economic Utility of Teaming Agreements and the Issue of Enforceability*, 49 Pub. Cont. L.J. 423, 431 (2020) (noting that the term "teaming agreement" does not appear in FAR subpart 9.6, Contractor Team Arrangements" and that "there is no prescribed format in the FAR for a teaming agreement; in fact, there is no express requirement in the FAR that such an agreement be written"); *id.* at 452 ("Although the FAR addresses the government's recognition of contractor team arrangements as well as the economic utility of such arrangements, a teaming agreement's enforceability looks to the law of its governing state.").

[25] As if things are not confusing enough, FAR 9.6 ("Contractor Team Arrangements") does *not* apply to the U.S. General Services Administration multiple award schedule ("MAS") contractor team arrangements ("CTAs"). https://perma.cc/DZL3-ZP93. For a MAS CTA, "the parties" to the agreement "remain independent contractors and not create a joint venture or separate subsidiary" but "each member(s) will operate as a prime contractor for the portion of work they perform and be responsible for their own employees." *Id.*; *see also* Defense Logistics Acquisition Directive 8.403(b)(S-90)(2) ("FAR subpart 9.6 Contractor Team Arrangements does not apply to

will "[h]old the prime contractor fully responsible for contract performance, regardless of any team arrangement between the prime contractor and its subcontractors." FAR 9.604(e).

Which leads us to another set of axioms that are worth making explicit. The government does not contract with the offeror's affiliates. Nor does the government contract with the offeror's proposed subcontractors. And that means that any relationship between the contractor and its subcontractors or affiliates is a private arrangement that exists outside the government contract, governed by separate agreements or corporate arrangements to which the government is not a party.

These fundamental principles yield an additional crucial corollary: *the past performance of an affiliate or subcontractor cannot be considered the experience or past performance of the offeror or contractor itself.* An affiliate's stellar track record does not magically become the offeror's track record by virtue of common ownership. A proposed subcontractor's decades of successful performance do not transform into the would-be prime contractor's own experience merely because that offeror proposes to have the identified subcontractor perform some portion of the contract work.

In other words, affiliates and subcontractors are all separate legal entities, and their respective histories remain separate and distinct. When an agency evaluates an offeror's proposal and considers the past performance of proposed subcontractors or affiliates, the agency is not crediting the offeror with the other entities' experiences as the offeror's own. Rather, properly considered, the agency is assessing whether the offeror's proposed performance — its plan to leverage the capabilities of other entities — is credible, realistic, and likely to result in successful contract performance.

This distinction may seem semantic, but it is legally significant. An offeror with no relevant past performance cannot bootstrap itself into a "satisfactory" past performance rating simply by proposing to use an experienced subcontractor. What the offeror can potentially demonstrate is that its overall proposed approach to performing the contract — which includes the use of that experienced subcontractor — is advantageous and likely to succeed.

---

GSA Schedules teaming."). With a typical prime-subcontractor relationship of the type that FAR 9.6 addresses, there is only one prime contractor. The same is true with a prime's affiliates; they are not in privity of contract with the government.

### 3. FAR 15.305 permits consideration of subcontractor past performance.

Despite the absence of universal definitions for contractors and subcontractors — or a useful definition of offeror — the FAR does provide limited guidance on an agency's consideration of past performance information belonging to entities other than the would-be prime contractor. In particular, FAR 15.305(a)(2)(iii) provides that "[t]he evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition."

This Court has several observations about this FAR provision.

First, the language is permissive: agencies "should" consider the specified information, but the language is not mandatory (it does not contain the commanding words of "shall" or "must"). This is not accidental. As the GAO has observed, FAR 15.305 "permits, but does not require, procuring agencies to consider the experience and past performance of these additional entities and personnel in evaluating an offeror's past performance." *MW-All Star Joint Venture*, B-291170.4, 2004 CPD ¶ 98, 2003 WL 23527069, *3 (Comp. Gen. Aug. 4, 2003).

Second, let us be clear about what this consideration entails: it is an assessment of the offeror's proposed approach and team, not an attribution of others' experience to the offeror itself. The provision directs agencies to "take into account" this information — not to credit it to the offeror as if it were the offeror's own performance. The agency is evaluating whether the offeror's team, as proposed, is likely to perform successfully. An offeror with a lack of relevant experience itself may still be evaluated favorably if it has assembled a credible team of experienced subcontractors and key personnel, but this is a prospective assessment of likely performance based on the specific proposal, not the attribution of the subcontractors' past performance to the offeror *per se*.

Third, the provision applies to "predecessor companies . . . or subcontractors that will perform major or critical aspects of the requirement." FAR 13.305(a)(2)(iii). This language contemplates meaningful involvement in contract performance, not mere window dressing. An offeror cannot expect favorable consideration simply by naming an experienced subcontractor in its proposal. The proposal ordinarily must demonstrate that the subcontractor will actually perform substantive work.

35

When it comes to affiliates, FAR 15.305 does not mandate their consideration either, though the Defense FAR Supplement ("DFARS") specifically requires that "[w]hen evaluating the past performance of an offeror that is a small business concern in response to a competitive solicitation, contracting officers shall consider relevant past performance information provided for affiliates of the offeror."  DFARS 215.305(a)(2)(C). This Defense Department and small business-specific requirement highlights the FAR's general silence on the matter.

What is clear, then, from the regulatory framework is that agencies have significant discretion in structuring their solicitations to define when and how they will consider the past performance and experience of team members — whether subcontractors or affiliates.  But regardless of how an agency structures its evaluation, the fundamental principle remains: *the past performance of affiliates and subcontractors is not the offeror's past performance per se*.  It is separate information that may inform the agency's assessment of the offeror's proposed approach to performing the contract in a particular procurement under a particular proposal.

### 4.  Four Solicitation Permutations.

Through decades of decisions from this Court and the GAO, a pattern has emerged regarding how agencies may structure their solicitations vis-à-vis subcontractors and affiliates.  The Court identifies four principal permutations.

*Permutation One: The Total Exclusion*.  A solicitation may expressly preclude the use of subcontractors and/or affiliates altogether.  In such cases, an offeror is limited to demonstrating its own independent capabilities and past performance — that is, the experience of the single entity that will be in privity of contract with the government.  In such a procurement, the agency is essentially communicating: "We will contract with one entity, and we want to evaluate that entity's own track record, not the track records of other entities it proposes to hire or with which it happens to be affiliated."

The GAO, for example, has enforced provisions that prohibit the utilization of subcontractors and/or affiliates.  *See CardioMetrix*, B-257408, 94-2 CPD ¶ 57, 1994 WL 413150, *1-2 (Comp. Gen. Aug. 3, 1994) (upholding a solicitation's explicit subcontracting limitation and rejecting plaintiff's contention that such limitation is "unduly restrictive"); *The EC Corp.*, B-236973, 90-1 CPD ¶ 23, 1990 WL 277516, *2 (Comp. Gen. Jan. 5, 1990) (denying a post-award protest and holding that "to the extent that the protestor's

36

[proposal] was inconsistent with the prohibition against subcontracting guard services, its [proposal] could properly be rejected as unacceptable since it took exception to a material requirements of the solicitation").

Depending on the nature of the procurement, this type of solicitation provision makes perfect sense from a risk management perspective. The government will be in privity only with the prime contractor. If the subcontractors fail to perform, the government's recourse is against the prime only, and not against the subcontractors, as explained *supra*. Therefore, an agency may want to ensure that the prime contractor itself — the entity that will bear contractual responsibility — has demonstrated capability and past performance.

When a solicitation contains such a prohibition, agencies must adhere to it. An agency cannot credit an offeror with subcontractor or affiliate experience if the solicitation expressly forbids subcontracting (or the use of affiliates). To do so would violate the fundamental principle that agencies must evaluate proposals in accordance with the stated evaluation criteria. *See* FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); *Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 514-15 (2018) (explaining that the text of the solicitation "governs how the proposals are to be evaluated").

On the other hand, the government cannot *arbitrarily* prohibit consideration of affiliates or subcontractors. The Competition in Contracting Act of 1984 requires that solicitations generally permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the needs of the agency. 10 U.S.C. § 2305(a)(1)(B)(ii). Where a protester challenges a solicitation provision as unduly restrictive of competition, the procuring agency may be forced to demonstrate that "the provision is reasonably necessary to meet the agency's needs." *Iyabak Constr., LLC*, B-409196, 2014 CPD ¶ 62, 2014 WL 523829, *2 (Comp. Gen. Feb. 6, 2014); *see also Total Health Res.*, B-403209, 2010 CPD ¶ 226, 2010 WL 4014391, *2-3 (Comp. Gen. Oct. 4, 2010) (solicitation requirement for specific experience on the part of the prime contractor was unduly restrictive of competition where the agency did not show that its needs could not be satisfied by a subcontractor with relevant experience).[26]

---

[26] *See also Iyabak Constr.*, 2014 WL 523829, *4 ("In sum, we find that the RFP's past performance and experience requirements are unduly restrictive of competition, given the agency's failure to explain why its needs could not be satisfied by a less restrictive method of evaluating offerors'

*Permutation Two: Limited Credit*.   A solicitation may permit the use of subcontractors and/or affiliates in an offer or proposal, but restrict the offeror from relying on its subcontractors' or affiliates' past performance or corporate experience for evaluation credit.   In this structure, for example, offerors may propose to use subcontractors or affiliates, and the agency may consider how these entities will contribute to performance under other evaluation factors (such as technical approach or management plan), but the offeror receives no affirmative evaluation credit for the subcontractors' or affiliates' track records under the past performance evaluation factor. *Cf. Constructure-Trison JV, LLC,* B-416741.2, 2018 CPD ¶ 397, 2018 WL 6191078, *3 (Comp. Gen. Nov. 21, 2018) (rejecting protest where the RFP expressly provided "that offerors were required to provide 'a signed copy of a joint venture agreement, partnership agreement, teaming agreement, approved mentor protégé agreement (MPA) or letter of commitment for each member of the Offeror's team identified' in the technical approach narrative").

This Court addressed such a provision in *KGJJ Eng'g Sols., LLC v. United States*, 161 Fed. Cl. 556, 566 (2022), where the solicitation provided that "[t]he [g]overnment will not consider any project submitted for experience that was performed by a firm other than the Offeror."   While there were exceptions for "first-tier small business subcontractors, joint ventures, parent companies, subsidiary companies, predecessor companies, or satellite offices of the offeror," there was "no exception for work done by affiliate or sister companies." *Id.* at 566.  Judge Bruggink held that this express exclusion controlled, and thus rejected the government's argument that the offeror's affiliates were part of the offeror's "team."  Judge Bruggink explained that while "affiliates supporting the offeror's performance were referred to as 'Team Members' in the Price and Past Performance factors," the solicitation's "definitions" subsection specifically defined "Offeror's Team"

---

past performance and experience.  That is, the Corps has not explained or shown why the agency's concerns with considering an affiliate's past performance and experience under the RFP are not satisfied by making such consideration contingent upon a firm commitment that the affiliate would participate meaningfully in the performance of the contract."); *but see Valor Constr. Mgmt., LLC*, B-405365, 2011 CPD ¶ 226, 2011 WL 5044562, *3 (Comp. Gen. Oct. 24, 2011) ("Here, the agency has determined that, given the complexity of the project, the past performance of team members which will lack contractual privity with the government does not lessen the risk of inadequate performance (and thus is not relevant) in the same way as the past performance of team members with which the agency will have a contractual relationship. In any case, while an agency may consider a subcontractor's information, it is not required to do so. . . . [T]he agency has a legitimate interest in assessing performance risk by considering only the experience and past performance of entities with which it will have contractual privity.").

as "the offeror and its 'first-tier small business subcontractor(s) only.'" *Id.* "Nowhere in the solicitation does it state that an affiliate's experience will be considered, either by itself or as a member of the offeror's team." *Id.*[27]

The GAO has similarly held that agencies must follow express prohibitions. In *Xtreme Concepts Inc.*, the Army Corps of Engineers' solicitation specified that "only the prime contractor's past performance information would be evaluated." B-413711, 2016 CPD ¶ 372, 2016 WL 7367629, *1 (Comp. Gen. Dec. 19, 2016). The Army Corps accordingly refused to evaluate a subcontractor's past performance and assigned the protestor a "neutral" rating. *Id.* at *2. While the GAO sustained the protest on other grounds, the GAO found that the agency's decision not to consider subcontractor past performance was entirely proper given the solicitation's express prohibition. *Id.* at *3 n.7.

This permutation recognizes the distinction between evaluating an offeror's proposed approach (which necessarily involves assessing the capabilities of proposed team members) and evaluating the offeror's own demonstrated track record. An offeror's plan to use experienced subcontractors may make its technical approach more credible or its management plan more feasible, but those subcontractors' successful past performance on other contracts does not become the offeror's past performance.

This approach makes sense when the agency wants to ensure that the prime contractor itself has a proven track record. After all, even the most experienced subcontractor cannot guarantee successful contract performance if the prime contractor lacks the capability to manage the effort. Again, the prime contractor — the entity in privity with the government — bears ultimate responsibility for the subcontractors' work. Therefore, the agency may reasonably decide to focus its past performance evaluation on the offeror's own demonstrated ability to successfully perform and manage similar contracts.

***Permutation Three: The Committed Teaming Requirement.*** A solicitation may permit the use of subcontractors or affiliates and allow the agency to consider their past

---

[27] *See also Veterans Electric, LLC v. United States*, 138 Fed. Cl. 781, 791 (2018) (concluding that the plain language of the solicitation required that the contractor itself — *i.e.*, "[the] party to [the] Government contract other than the Government" — must satisfy the solicitation's contractor qualifications without referencing the capabilities of a proposed subcontractor (internal quotations omitted)); *Tele-Consultants, Inc. v. United States*, 142 Fed. Cl. 686, 695 (2019) (noting that "offerors were not permitted to rely upon the corporate experience or past performance of other legal entities" and that "doing so would render them ineligible for award").

performance or experience in the evaluation, but require proof that the offeror has actually entered into agreements with its proposed subcontractors or a demonstration of how the affiliate will be used (and that the affiliate is committed to performing the work). This is where CTAs under FAR 9.601 become particularly relevant. When an agency requires documented teaming agreements, it is seeking assurance that the proposed arrangement is more than aspirational — that the offeror has secured commitments from its teammates and that the proposed relationships are genuine and enforceable.

For example, in *Strategic e-Business Solutions., Inc.*, the GAO addressed a solicitation requirement that permitted offerors to meet an experience requirement "with a combination of experience from the prime and subcontractor(s)." B-310210, 2007 CPD ¶ 206, 2007 WL 3313150, *1 (Comp. Gen. Nov. 8, 2007). The solicitation specifically permitted the would-be prime to "use experience across multiple legal entities that are owned under a single corporate umbrella[,]" but required that "[s]ubcontracting agreements and the establishment of new legal entities must be final at the time of proposal submission." *Id.* The protestor asserted the government had erred in rejecting the protestor's proposal "for failing to furnish a fully-negotiated subcontracting agreement." *Id.* at *2. "Contrary to the protester's position," the GAO reasoned, "the RFP required more than written evidence of an agreement to enter into a subcontract; the RFP language . . . clearly provided that any subcontracting agreements on which an offeror relied to establish the required experience had to be 'final' at the time of proposal submission." *Id.*

Similarly, in *G4S-SJC, LLC*, an agency found that the protestor, G4S:

> failed to demonstrate designer experience because all of the projects submitted under the designer experience subfactor were performed by entities other than G4S and, under the terms of the solicitation, none of these projects could be considered because G4S failed to submit evidence of a binding teaming agreement or other contractual agreement between G4S and its design subcontractor.

B-409694, 2014 CPD ¶ 229, 2014 WL 3940304, *3 (Comp. Gen. July 14, 2014). G4S's proposal referred to a specific party as the "Design Partner," but the GAO concluded "in the context of this procurement, if [the Design Partner] was not the offeror or a joint venture partner, it must have been a subcontractor." *Id.* at *4. With regard to

subcontractors, however, "the RFP required that offerors submit evidence of a binding teaming agreement or other contractual agreement." *Id.* Because "G4S did not submit such an agreement between itself" and the Design Partner, "the agency reasonably concluded that it could not consider the projects submitted under the designer experience factor because none of the projects were performed by G4S, and the protester failed to submit the requisite contractual agreements to allow the agency to consider projects performed by other entities." *Id.*

Another important point emerges from the *G4S* decision:

> [T]o the extent that the protester contends that [the Design Partner] was not a subcontractor, we note that the relationship between G4S and [the Design Partner] as shown in G4S's proposal was, at best, ambiguous. In this regard, it is an offeror's responsibility to submit a well-written proposal, with adequately detailed information which clearly demonstrates compliance with the solicitation requirements and allows a meaningful review by the procuring agency.

2014 WL 3940304, *4 n.3.

The requirement for documented teaming agreements serves several purposes. First, it ensures that the offeror is not simply name-dropping more experienced companies without any actual commitment from those companies. Second, it gives the agency some concrete assurance that the proposed team is real and will actually perform the awarded scope of work together. Third, it *may* provide some basis for holding the prime accountable if it attempts to substitute different subcontractors after award.

***Permutation Four: The Silent Solicitation Default Rule.*** Perhaps the most common scenario is where the solicitation does not say anything about affiliate or subcontractor past performance — either regarding how the agency will consider it or what an offeror must demonstrate in its proposal to obtain proposal credit for it. In this scenario, a default rule applies: the procuring agency may consider the experience or past performance of subcontractors or affiliates of an offeror, so long as the offeror explains how the subcontractors or affiliates will be used to perform the work.

41

Both this Court and the GAO have consistently articulated the same foundational principle: "[A]n agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror." *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 747 (2008) (quoting *Hot Shot Express, Inc.*, B–290482, 2002 C.P.D. ¶ 139, 2002 WL 1831022, *2 (Aug. 2, 2002)); *see also Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 188 (2014), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015); *Sterling Med. Assocs., Inc. v. United States*, 177 Fed. Cl. 550, 570 (2025); *Anham FZCO v. United States*, 144 Fed. Cl. 697, 712 (2017). The relevant consideration is "whether the resources of the parent or affiliated company — its workforce, management, facilities or other resources — will be provided or relied upon for contract performance such that the parent or affiliate will have meaningful involvement in contract performance." *Peraton, Inc.*, B-421038, 2023 CPD ¶ 92, 2023 WL 3093354, *11 (Comp. Gen. Apr. 12, 2023); *see also Inquiries, Inc.*, B-418486, 2020 CPD ¶ 182, 2020 WL 3034820 (Comp. Gen. May 27, 2020). Examples of meaningful involvement include "reliance on the 'workforce, management, facilities or other resources' of the parent or affiliated company." *Anham FZCO*, 144 Fed. Cl. at 712 (quoting *IAP World Servs. Inc*, B-407917.2, 2013 CPD ¶ 171, 2013 WL 2817472 (Comp. Gen. July 10, 2013)).

In *IAP World Servs., Inc.*, the Navy credited a joint venture with the corporate experience and past performance of two subsidiaries of the joint venture member's parent company. B-407917.2, 2013 CPD ¶ 171, 2013 WL 3817472, *7 (Comp. Gen. July 10, 2013). The joint venture's other member had a senior vice president who sat on the joint venture's board of managers and was responsible for that member's operations and maintenance division. The Navy and intervenor argued that this senior vice president's position on the joint venture's board demonstrated "a commitment of resources or performance on the part of the parent company." *Id.* The GAO disagreed, holding that "[e]ven accepting that the . . . vice-president's position on the joint venture's board of managers demonstrates a commitment of resources by the parent corporation, this does not show a commitment of resources from other separate corporate subsidiaries." *Id.* Nor did it "show that other . . . subsidiaries will be meaningfully involved in contract performance." *Id.*

But the mere fact of affiliation is insufficient. As the GAO explained in *Language Select LLP*:

> [W]here an agency observes apparent affiliation between companies but lacks evidence establishing the nature of the relationship in the procurement at issue, the potential for variations in the extent and nature of the relationship between two affiliated companies means that it is not reasonable for that agency simply to infer that the relationship will affect contract performance[.]

B-415097, 2017 CPD ¶ 359, 2017 WL 5969279, *7 (Comp. Gen. Nov. 14, 2017).  Before an agency can properly attribute the past performance of an affiliate to an offeror, "it generally must have a factual basis showing the planned relationship between the companies *on the contract at issue*." *Id.* (emphasis added); *see also ST Aerospace Engines Pte. Ltd.*, B-275725, 97-1 CPD ¶ 161, 2017 WL 5969279 (Comp. Gen. Mar. 19, 1997); *Peraton*, 2023 WL 3093354, *11 ("[I]t is inappropriate to consider an affiliate's record where that record does not bear on the likelihood of successful performance by the offeror and where there is no evidence that the affiliate will meaningfully contribute to performance.").

General statements of corporate unity are also insufficient.  In *Advanced Management Strategies Group, Inc./Reefpoint Group, LLC v. United States*, Judge Bruggink found that "other than naming the two entities together and citing [the affiliate]'s experience, the proposal draws no link to assure the agency that 'the resources of the ... affiliated company will affect the performance of the offeror.'" 139 Fed. Cl. 404, 417 (2018) (quoting *Femme Comp*, 83 Fed. Cl. at 747).  Judge Bruggink thus held that where "there is no documentary support for the agency's reliance on [the affiliate]'s corporate healthcare experience," the agency acted arbitrarily in crediting the offeror with that experience. 139 Fed. Cl. at 417.

In contrast, in *Ahtna Logistics, LLC v. United States*, this Court found an adequate demonstration of commitment where the proposal explained that an affiliate company's "management personnel, Subject Matter Experts (SMEs), resources, technology tools, company policies and business processes, and the company Quality Management System (QMS) are being directly transferred from [the affiliate] to [the contractor] to provide specific expertise." 163 Fed. Cl. 488, 513-14 (2022).  The proposal at issue in that case identified "thirteen specific people" from the affiliate "who would be part of [the contractor's] corporate leadership, the shared services that span [the affiliate and the

43

contractor]," as well as listing "shared systems, plans, and policies." 163 Fed. Cl. at 514 (cleaned-up). This level of specificity was sufficient.[28]

\* \* \* \*

What emerges from this regulatory and decisional thicket is a framework governed more by solicitation-specific terms than by universal rules. But underlying all four permutations is a single, unifying principle: there is one offeror, which becomes *the* prime contractor when awarded the contract, and that entity alone is in privity with the government. Subcontractors and affiliates are separate legal entities whose experience and past performance remain their own. Because the FAR does not provide universal definitions of "contractor" and "subcontractor," and because it grants agencies wide latitude in structuring their evaluation criteria, the answer to "Can I get credit for my affiliate's or subcontractor's past performance?" is invariably: "It depends."

It depends on whether the solicitation expressly prohibits such consideration (Permutation One). It depends on whether the solicitation allows affiliate or subcontractor use but restricts evaluation credit under the past performance factor (Permutation Two). It depends on whether the solicitation requires documented teaming arrangements or proof of affiliate commitment (Permutation Three). And if the solicitation is silent, it depends on whether the offeror has adequately explained how the subcontractor or affiliate will be involved in performance (Permutation Four).

---

[28] Solicitations may also distinguish between subcontractors and affiliates. In *Nat'l TRU Sols., LLC*, the GAO addressed whether an affiliate should be treated as a "teaming subcontractor" or as an "affiliate." B-420913, 2022 CPD ¶ 277, 2022 WL 19661852, *19 (Comp. Gen. Nov. 3, 2022). The solicitation permitted newly formed entities to utilize affiliate resources including "material supplies, equipment, personnel, or other tangible assets," as well as "expertise, best practices, lessons learned, or similar resources." *Id.* at *21. The solicitation further instructed, however, that offerors not include the names of non-teaming subcontractors in their technical proposals. *Id.* at *20. The awardee, a newly formed entity, included over 40 references to its affiliate, including detailed discussions of the affiliate's past performance, capabilities, and innovations. *Id.* at *22. The protestor argued that the affiliate was being offered as a "teaming subcontractor" subject to the solicitation's requirements for such entities. *Id.* The GAO disagreed, finding the agency reasonably evaluated the affiliate as such. *Id.* Critically, the offeror had included its affiliate's commitment letter in the proposal, making "it clear that the loaned personnel would be employed directly by [the offeror]." *Id.* at *21. The GAO held that "the solicitation does not include a similar prohibition on referencing or relying on the proposed resources of an affiliate" even though it prohibited naming non-teaming subcontractors. *Id.* at *22.

But in all four permutations, the fundamental reality is the same: *when an agency considers the past performance of a subcontractor or affiliate, it is not converting that experience into the offeror's own past performance.* Rather, the agency is making a prospective judgment about whether the offeror's proposed approach — which includes the use of certain teammates — is likely to result in successful contract performance.

In sum, both offerors and agencies must remember that federal contracting is built on the general principle of privity: one government, one contract, one contractor. Subcontractors and affiliates may play critical roles in performance, but they remain separate legal entities. Their experience is their experience, their past performance is their past performance, and their contractual obligations run to the prime contractor, not to the government. No amount of creative proposal writing or evaluation gymnastics can change this fundamental legal reality.

Having established the regulatory framework and four permutations of solicitation structure, the Court now turns to the specific facts before it.

### 5. On this record, the government's evaluation of Solute's past performance is arbitrary and capricious.

The proposal instructions in § L for Volume III — which covers organizational experience (factor 1) and past performance (factor 2) — were rather sparse. As noted above, offerors had to submit an organizational experience matrix "to explain the breadth, depth, and relevance of *your* organizational experience since 01 January 2018" in certain key areas. AR 232 (§ L-2, ¶ 3.1(a)) (emphasis added). The RFP did not define "your," nor did it address corporate entities affiliated with the offeror. Offerors had to illustrate their experience via "references," including "at least one (1) reference for work performed by the prime offeror, no more than one (1) reference per subcontractor, and no more than three (3) references total." AR 232 (§ L-2, ¶ 3.1(a)). The Solicitation further instructs offerors to "[c]ite references in the following order: work performed by the prime, then work performed by the subcontractor." *Id.* From this line, the Solicitation appears to assume the offeror will only be using references from itself or subcontractors; no mention is made of affiliates. But neither is there any express restriction on an offeror's using a reference from an affiliate.

The Solicitation further provides that the "[t]he references submitted under [§ L] paragraph 3.1 above will be used to evaluate past performance." AR 233 (§ L-2, ¶ 3.2(a)). The evaluation criteria in § M aligns in the main with the proposal instructions, with the

45

exception that "[Evaluation] Factor 1 – Organizational Experience" refers only to an "offeror's organizational experience," but does not mention either affiliates *or subcontractors*. AR 239 (§ M-2, ¶ 2.1). The same is true for "[Evaluation] Factor 2 – Past Performance." *Id.* (§ M-2, ¶ 2.2). That section, as well, makes no mention of affiliates or subcontractors.

In sum, the Solicitation did not expressly prohibit the use of affiliates or subcontractors, nor did it contain language restricting the consideration of teammate past performance. Nor did the Solicitation require offerors to submit documentation of committed teaming agreements. Accordingly, this case falls closest to Permutation Four, *supra*; the Solicitation certainly does not fit into Permutations One, Two, or Three.

Because we are in Permutation Four, Solute's proposal must identify specific resources (personnel, facilities, certifications, systems) of its affiliate, explain how those resources will be used on the solicited contract, and demonstrate that the affiliate is committed to providing those resources. As this Court in *American Auto Logistics* observed, while a corporate family "may be composed of hundreds of legal entities," creating a potentially "heavy burden to require every individual entity that is to be involved in a proposed contract to independently certify its involvement," it is nevertheless the requirement "to make[] clear that the resources of the parent or affiliated company will affect the performance of the offeror" such that "the past performance references of the parent or affiliate can be acknowledged." *Am. Auto Logistics*, 177 Fed. Cl. at 193 (internal quotations omitted). Vague statements about affiliation, shared management, or corporate unity are insufficient.

The precise question for this Court is thus whether, under that legal standard, the government could properly assign Solute's proposal a "Substantial Confidence" rating for past performance where, as here, Solute relied on its affiliate. AR 1189.[29] As noted above, Solute provided three references for the organizational experience matrix. The first reference was from Sigma Defense Systems LLC. AR 861. Solute identified Sigma as "Solute's parent company." *Id.* The other two references were from Booz Allen Hamilton — a subcontractor — and Solute itself. *Id.*

In describing the Sigma reference, Solute noted that it is "a Sigma Defense Company." AR 863. Solute further noted, once again, that Sigma is "Solute's parent

---

[29] Noblis and Solute received identical ratings across the board. AR 1189.

company." *Id.* Solute's description of reference number 1 (from Sigma) repeatedly refers, throughout the document, to "Team Solute," but never once defines the term in the Volume III. AR 863-67. In contrast, reference number 3 (from Solute itself) does not refer to "Team Solute," but rather only to Solute. AR 875-79. The reason for the difference in terminology is not apparent and is not explained.

There is no evidence that the government properly distinguished between the offeror, Solute, and its affiliate or even its proposed subcontractor. The SSEB Report, for example, repeatedly and consistently refers to Solute, Sigma, and Booz Allen Hamilton, collectively, as "the offeror." AR 1154-67; AR 1172-73. That the SSEB failed to distinguish between Solute, as the offeror, and its affiliate (Sigma) and proposed subcontractor (Booz Allen Hamilton) is most clearly seen in the SSEB Report, which concluded that "*collectively,* through the three references, *the offeror* covered work that involved essentially the same scope and magnitude of effort and complexities this solicitation requires." AR 1173 (emphasis added). The SSDD repeats the same language, referring to all three of Solute's organizational experience and past performance references as being from "the offeror." AR 1193-94. Notably, the SSDD often refers to Solute in the plural possessive — *e.g.*, "their efforts"; "how they supplied"; "how they investigated" — without specifying what "their" or "they" specifically means. *Id.*

The bottom line is that there is simply no evidence — no indication whatsoever — that the Navy evaluators and source selection officials understood that Sigma and Solute are different entities. And nothing in Volume III of Solute's proposal sheds any light on the critical issues: whether and how Sigma was committed to performing any contract awarded to Solute.

Solute, however, points to its cost proposal in Volume II. AR Tab 31. There, Solute explains, is all the information this Court needs to salvage the agency's decision here. *See* Tr. 56:17-57:15 (counsel for Solute directing this Court to Solute's cost proposal for a description of "how Sigma's resources would affect performance"). But in that volume, Solute similarly vacillates between referring to itself as "Solute" and "Team Solute." *See, e.g.*, AR 968. And though Volume II references Sigma Defense Systems as Solute's parent company, AR 986 — and indicates that "Sigma and its wholly owned subsidiary, Solute, became fully integrated," AR 988 — Volume II nowhere explains the systems, personnel, or other resources that Sigma will dedicate to Solute's performance, should Solute be awarded the contract. AR 988.

This Court acknowledges Solute's further assertion, in Volume II, that Solute's integration with Sigma "brings the collective capabilities together under a single management team" and that "the two companies are treated as a single segment with shared indirect rates allowing the free flow of talent across both segments of the company." AR 988. But none of that is sufficient — on this record — to support the Navy's giving Sigma credit for Solute's reference in Volume III. For starters, talent may be able to flow freely across the integrated companies, but precisely what Sigma talent has been committed to Solute's performance of the contract at issue? Is it the same talent that performed the Sigma contract described in reference 1 (of Volume III), or did Sigma plan to deploy only one person from its management who had nothing to do with the Sigma contract that Solute referenced?

There are even more significant problems with Solute's argument: Solute's proposal in Volume I critically undercuts Solute's reliance on Volume II to explain what role Sigma would play. In particular, Solute describes itself at length, but never once mentions its parent company, Sigma. AR 660. To make matters worse, Solute included a "table [that] that introduces **Team SOLUTE** which is composed of both large and small business with extensive CANES experience who are ready on Day 1 to successfully execute." AR 660 (emphasis added). The table contains a list of 10 companies, AR 660-61, but the company that is not on the list is Sigma.[30]

There is yet another fatal defect in Solute's argument, which relies on language in Solute's proposal Volumes I and II. The Navy's Source Selection Plan ("SSP") indicates that while the SSEB would evaluate organizational experience and past performance, "[t]he Contract Specialist will be the sole evaluator for Acceptability of the Offer . . . and Cost." AR 42 (¶ 3.3.3). The SSP further indicates that the contract specialist "will not evaluate any other factors" and that "the SSEB *will not have access to cost proposals*." *Id.* (emphasis added). In other words, there is no reason to assume — in the absence of any documentation to the contrary — that the SSEB or the source selection authority even saw the verbiage from proposal Volumes I and II upon which Solute now relies, let alone that such Navy officials considered it in the manner Solute suggests. The simple fact is that

---

[30] Solute points to the fact that the cover sheet for the volumes indicates that Solute's Vice President of Contracts — who signed the proposal — has a Sigma Defense email address. AR 657. But the fact that the Sigma and Solute may share some executives does not meet the legal standard for obtaining experience and past performance credit for an affiliate's prior work. Moreover, when that same executive signed the proposal, he did so on behalf of "SOLUTE, a Sigma Defense Company" — and not on behalf of Sigma itself. AR 661.

an evaluator reviewing Solute's Volume III (which includes its references for organizational experience and past performance) would have no way to understand — from that volume alone — what role Sigma would play in performance.

Solute's proposal simply does not address: what tasks Sigma personnel would perform; what percentage of the work Sigma would perform; whether Solute and Sigma entered into some sort of intra-corporate family agreement, defining service levels or responsibilities; how Solute would manage and oversee Sigma employees; whether Sigma was truly committed to participating in the performance of the contract; or what resources (*e.g.*, personnel, facilities, systems) Sigma would contribute to Solute's contract performance. Solute's level of generality falls far short of what the case law requires.

The GAO's decision in *Kauffman and Associates, Inc.*, is instructive here. In that matter, the GAO sustained multiple grounds of protest, including an issue regarding proposal volumes. *Kauffman and Associates, Inc.*, B-421917.2, 2024 CPD ¶ 40, 2024 WL 582907, *1 (Jan. 29, 2024). The solicitation required past performance information to be submitted in a specific volume of the proposal. *Id* at *12. The putative awardee placed some of its past performance information in the wrong volume, however — specifically, in a different section of its quotation than the one designated for past performance evaluation. *Id* at *13. The GAO held that the agency's evaluation was flawed because it improperly considered information that was not contained in the correct proposal volume. *Id.* While the *Kauffman* decision did not involve affiliates specifically, it establishes an important principle: when a solicitation specifies separate volumes for different evaluation factors, agencies must evaluate proposals based on the information contained in the designated sections, and cannot cure deficiencies by importing information from other proposal volumes.

Nor is the reference to a "Team" sufficient — even assuming Solute had used the phrase "Team SOLUTE" consistently across its proposal volumes, which it did not. *See MetroStar Sys., Inc.*, B-416377.5, 2020 CPD ¶ 135, 2020 WL 1888881, *7 (Comp. Gen. Apr. 2, 2020) (finding an agency's assignment of affiliate experience unreasonable where the proposal contained only "generalized references to 'Team CACI,'" which "could be oblique references to the involvement of these affiliates," and explaining that such "references are simply too vague to evidence the meaningful involvement of either affiliate").[31]

---

[31] In *Konecranes Nuclear Equip. & Servs., LLC v. United States*, the Court upheld the agency's consideration of affiliate resources where the offeror "represented that [offeror] and [affiliate]

The bottom line is that Solute's proposal failed to provide a factual basis sufficient for the Navy to attribute affiliate past performance to the prime offeror. Solute needed to, but did not, demonstrate "the planned relationship between the between the companies on the contract at issue." *ST Aerospace Engines Pte. Ltd.*, B-275725, 97-1 CPD ¶ 161, 1997 WL 223977, *4 (Mar. 19, 1997). As this Court held in *Femme Comp*, "[a]n agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror." 83 Fed. Cl. at 747 (quoting *Hot Shot Express,* B–290482, at *2). The relevant consideration is "whether the resources of the parent or affiliated company — its workforce, management, facilities or other resources — will be provided or relied upon for contract performance such that the parent or affiliate will have meaningful involvement in contract performance." *Inquiries, Inc.*, B-418486, at *7. Solute's proposal does not meet this standard.

In the absence of the Navy evaluation records disclosing on what basis it credited Solute's proposal with Sigma's past performance reference, and given the lack details in Solute's proposal, this Court concludes that the agency improperly evaluated Solute's past performance. At best, it appears that the Navy essentially inferred that because Solute and Sigma are affiliates, Sigma's resources and experience would automatically be available to Solute. But as this Court and GAO have repeatedly held, affiliation alone does not support such an inference. *Language Select LLP*, B-415097, at *7 ("[T]he potential for variations in the extent and nature of the relationship between two affiliated companies means that it is not reasonable for that agency simply to infer that the relationship will affect contract performance[.]"); *ST Aerospace Engines*, B-275725, at *4 ("Given the potential for variations in the extent and nature of the relationship between two companies that are affiliated, it is not reasonable for an agency simply to accept, without more, an offeror's representation that the performance of an affiliated company — positive or negative — should be attributed to that offeror.").

Finally, the requirement for adequate contemporaneous documentation is well-established. The agency cannot cure deficiencies in the contemporaneous record through post-hoc rationalizations. The evaluation record must demonstrate that the agency actually considered whether the affiliate or subcontractor would be meaningfully

---

'operate as an integrated enterprise'" and where, "as part of a pre-award survey," the affiliate "guaranteed the resources required for performance of the contract." 165 Fed. Cl. 421, 434 (2023). Here, in contrast, Solute nowhere included such a guarantee from its affiliate, Sigma.

involved before crediting the offeror with that entity's experience.  In *Advanced Management Strategies Group*, this Court held that absent documentary support showing "that 'the resources of the . . . affiliated company will affect the performance of the offeror,'" the agency acted arbitrarily in relying on affiliate experience.  139 Fed. Cl. at 417 (quoting *Femme Comp*, 83 Fed. Cl. at 747).  This Court emphasized: "We therefore conclude that the agency acted arbitrarily in awarding a 'substantial confidence' rating . . . . It necessarily follows that the best value determination and award . . . were also irrational."  139 Fed. Cl. at 417.

Accordingly, on this record, the agency in this case exceeded the bounds of its discretion by crediting Solute with Sigma's past performance in the absence of information about how Sigma would actually be involved in contract performance. Solute's failure to explain Sigma's role in the proposal volume designated for evaluation of organization experience and past performance, combined with the agency's failure to require such an explanation — at a minimum, via discussions — and given the government's lack of an explanation for how or why it credited Solute for Sigma's past performance reference, resulted in an unreasonable evaluation that prejudiced Noblis.

This Court next turns to the issue of relief.

### D.  Noblis Waived Any Entitlement to Injunctive Relief

Noblis did not come close to meeting its burden to demonstrate that it is entitled to equitable relief.

*First*, Noblis's complaint does not specifically ask this Court to enjoin the government's or Solute's performance of the awarded contract.  Rather, Noblis asks only that this Court: declare the award to Solute unlawful pursuant to the APA's standard of review; direct the Navy to re-evaluate proposals in accordance with the terms of the RFP and the law; and "[p]rovide such other and further relief as the Court deems just and proper."  Compl. at 33 ("Prayer for Relief").

*Second,* while Noblis repeats the complaint's Prayer for Relief almost verbatim in its MJAR's perfunctory conclusion, Pl. MJAR at 30-31, Noblis's only other reference to equitable relief is its assertion in the MJAR introduction that "the Navy's award to Solute should be permanently enjoined."  *Id.* at 7.  Noblis does not, however, brief any of the prerequisite injunctive relief factors.  This omission forecloses any path Noblis might

51

have had to obtain the contract at issue. Indeed, the Federal Circuit's decision in *PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004), all but ties this Court's hands.

In *PGBA*, the Federal Circuit established several critical principles. The first is that succeeding on the merits of a bid protest does not automatically entitle the plaintiff to injunctive relief. Rather, this Court always has the discretion to grant or deny such relief. *PGBA*, 389 F.3d at 1226 ("This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides the Court of Federal Claims with discretion in fashioning relief. Interpreting section 1491(b)(4) as requiring the court to enjoin all agency decisions found to be arbitrary, capricious, an abuse of discretion, or otherwise unlawful, would read the discretionary language out of section 1491(b)(2) by effectively rewording the statute[.]").

The second principle *PGBA* established is that a plaintiff cannot avoid the mandatory injunctive relief prongs by reframing its request for equitable relief as merely one for a declaratory judgment. As the Federal Circuit in PGBA recognized, "[a] declaratory judgment is not available as an academic exercise, and the coercive effect of one here would encounter all of the objections to injunctive relief." *PGBA*, 389 F.3d at 1228 (Fed. Cir. 2004) (quoting *Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 611 (4th Cir.1970)).

Finally, as Judge Meyers explained in *IAP World Servs., Inc. v. United States*:

> An injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curium) (citation omitted). Whether to grant an injunction lies within the sound discretion of the Court. When considering whether to grant permanent injunctive relief, this Court considers:
>
> > (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive

> relief; and (4) whether it is in the public interest to grant injunctive relief.

152 Fed. Cl. 384, 396–97 (2021) (quoting *PGBA*, 389 F.3d at 1228-29); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." (citing *PGBA*, 389 F.3d at 1228–29)).

Although Noblis succeeds on the merits of its MJAR argument[32] that the Navy improperly considered Sigma's past performance, Noblis did not address any of the other injunctive relief factors. Noblis did not even attempt to meet its burden to obtain the "extraordinary and drastic remedy" of an injunction. 152 Fed. Cl. at 396. Both Solute and the government correctly picked up on that omission. Solute points out that "Noblis has failed even to mention the three remaining injunctive relief factors, much less show that they weigh in its favor." Solute MJAR at 43. The government makes the same point: "Noblis does not appear to address harm at all" and "fails to present any arguments regarding the balance of harms or the public interest." Def. MJAR at 43.

This Court agrees with Solute and the government. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) (holding that the district court was "entirely correct in insisting that respondent satisfy the traditional prerequisites of extraordinary equitable relief by establishing irreparable harm"). But that's not the end of the problem for Noblis. Even after Solute and the government pointed out Noblis's failure to address the injunctive relief factors in its MJAR, Noblis did not even attempt to take up the issue in its reply brief. Whether Noblis declined to do so because its counsel thought it would draw attention to a conspicuous omission, this Court cannot say. Either way, the fact is that Noblis *nowhere* addressed the permanent injunctive relief factors. This Court will not presume that any of those factors weigh in Noblis's favor.

---

[32] This Court notes that the argument regarding Sigma — although developed by the parties' various MJAR briefs — does not appear to form the basis of *any* count in Noblis's complaint. Nor did Noblis seek leave to conform its complaint to the arguments in Noblis's MJAR. On the other hand, neither defendant objected to Noblis's argument on the grounds that it is not in the complaint.

Accordingly, and particularly given Noblis's failure to address irreparable harm, this Court will *not* order any equitable or injunctive relief.

## VI.    CONCLUSION

Noblis's motion to supplement the administrative record is **DENIED**.  Noblis's MJAR is **GRANTED** with respect to its allegation that the Navy improperly evaluated Solute's past performance; Noblis's MJAR is otherwise **DENIED**.  The defendants' respective cross-MJARs are **DENIED**.  This Court **DENIES** Noblis's request for permanent injunctive relief to the extent it was requested and, thus, will neither order the government to halt performance of the awarded contract, nor to redo any aspect of this procurement.

Noblis, however, may file a motion for bid and proposal costs on or before **Monday, April 13, 2026**.  The government may file an opposition brief on or before **Monday, April 27, 2026**.  This Court cautions Noblis, however, that this Court is far from convinced that Noblis can demonstrate that it should receive such costs.  If Noblis decides not to seek bid and proposal costs, it shall file a status report indicating that, on or before **Monday, April 13, 2026** (*i.e.*, in lieu of a motion).

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Chief Judge
